862 So.2d 687 (2003)
Duane OWEN, Appellant,
v.
STATE of Florida, Appellee.
No. SC95526.
Supreme Court of Florida.
October 23, 2003.
Rehearing Denied December 19, 2003.
*690 Glenn H. Mitchell, West Palm Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence entered in the Fifteenth Judicial Circuit Court imposing the death penalty upon Duane Owen. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the judgment and sentence under review.
This is the second appearance of Duane Owen before this Court to review a conviction and sentence of death for the murder of fourteen-year-old Karen Slattery. In 1990, we reversed his original conviction and sentence of death and remanded for a retrial. See Owen v. State, 560 So.2d 207, 212 (Fla.1990).[1] In early 1999, following retrial, Owen was again found guilty by a jury of the offense of first-degree murder, and was further found guilty of attempted sexual battery with a deadly weapon or force likely to cause serious personal injury and burglary of a dwelling while armed.
In March 1999, the same jury recommended, by a ten-to-two vote, that Owen should be sentenced to death. The judge followed the jury's recommendation, and on March 23, 1999, Owen was adjudicated guilty and sentenced to death for the murder of Karen Slattery.[2]
In support of the sentence of death, the trial court found that four aggravating circumstances existed to support the death sentence: (1) the defendant had been previously convicted of another capital offense or a felony involving the use of violence to some person; (2) the crime for which the defendant was to be sentenced was committed while he was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit the crime of burglary; (3) the crime for which the defendant was to be sentenced was especially heinous, atrocious, or cruel (HAC); and (4) the crime for which the defendant was to be sentenced was committed in a cold and calculated and premeditated manner without any pretense of moral or legal justification (CCP). In mitigation, the trial judge considered three statutory mitigating factors: (1) the crime for which the defendant was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance; (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was substantially impaired; and (3) the age of the defendant at the time of the crime was twenty-three. The trial court also considered *691 sixteen nonstatutory mitigating factors.[3]

PROCEDURAL HISTORY
Duane Owen has an extensive criminal history, with this appeal marking his sixth occasion before this Court. As noted above, Owen first appeared before this Court in 1990 seeking review of the sentence of death he received following the original Slattery murder trial. This Court reversed his conviction on the basis of a Miranda[4] violation. See Owen, 560 So.2d at 211. There, this Court held that the law enforcement officers questioning Owen about the Slattery homicide violated the dictates of Miranda when they continued to question him after he responded to two of their questions with the answers "I don't want to talk about it" and "I'd rather not talk about it." See id. Following well-established principles of law applicable at the time, this Court explained that "a suspect's equivocal assertion of a Miranda right terminates any further questioning except that which is designed to clarify the suspect's wishes." Id. Applying this rule of law, this Court determined that Owen's responses of "I don't want to talk about it" and "I'd rather not talk about it" were "at the least, an equivocal invocation of the Miranda right to terminate questioning, which could only be clarified." Id. The law enforcement officers continued to question Owen after his responses and failed to clarify his wishes, and, therefore, this Court held that Owen's right to terminate questioning was violated, and any statements made after his right was violated, namely his confession to the Slattery murder, should have been suppressed. The trial court had failed to suppress the statements, an error that this Court determined was not harmless, which prompted this Court to reverse Owen's convictions and remand for retrial. See id.
Owen's next appearance before this Court came in 1992 in the direct appeal of a sentence of death imposed upon him for the murder of Georgianna Worden. See Owen v. State, 596 So.2d 985 (Fla.1992). The facts surrounding the death of Worden were substantially similar to those of the Slattery murder. As this Court detailed, "The body of the victim, Georgianna *692 Worden, was discovered by her children on the morning of May 29, 1984, as they prepared for school. An intruder had forcibly entered the Boca Raton home during the night and bludgeoned Worden with a hammer as she slept, and then sexually assaulted her." Id. at 986. This Court affirmed the conviction and sentence of death in that case and, notably, held that there was sufficient evidence to support the trial court's findings that the murder was especially heinous, atrocious, or cruel and that the murder was committed in a cold, calculated, and premeditated manner. See id. at 990.
In 1997, Owen was again before this Court in connection with a question certified by the Fourth District Court of Appeal, which related to the admissibility of Owen's confession to the Slattery murder. See State v. Owen, 696 So.2d 715 (Fla. 1997). Following this Court's decision in Owen's first direct appeal for the Slattery homicide, but before his retrial, the United States Supreme Court issued an opinion in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). As this Court outlined, Davis held that "neither Miranda nor its progeny require police officers to stop interrogation when a suspect in custody, who has made a knowing and voluntary waiver of his or her Miranda rights, thereafter makes an equivocal or ambiguous request for counsel." Owen, 696 So.2d at 717. Prior to Owen's retrial, the State requested that the trial court reconsider the admissibility of Owen's confession in light of Davis, and the trial court concluded that the confession was inadmissible. See id. The district court of appeal subsequently denied the State's petition for a writ of certiorari because this Court had previously ruled that the confession was inadmissible, thereby making the decision of inadmissibility the law of the case. See id. However, the district court certified the following question to this Court: "Do the principles announced by the United States Supreme Court in Davis apply to the admissibility of confessions in Florida, in light of Traylor v. State?" Id. at 716 (citations omitted).[5]
Initially, this Court held that while the ruling in Davis pertained specifically to requests for counsel, the reasoning upon which the decision was based was equally applicable to requests to terminate interrogation. See Owen, 696 So.2d at 718. Further, this Court held that Traylor did not control, because in Traylor the defendant made no indication that he wished to invoke his Miranda rights, while Owen made an equivocal request to terminate questioning. See id. at 719. We proceeded to apply the Davis rationale to the issue before us, and, answering the certified question in the affirmative, held that "police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her Miranda rights." Id.
Finally, we analyzed the law of the case doctrine and determined that "the [United States] Supreme Court's decision in Davis qualifies as an exceptional situation" and therefore the law of the case as to the admissibility of Owen's confession, as determined in Owen's first direct appeal, could be modified. Id. at 720. This Court reasoned: "[R]eliance upon our prior decision in Owen's direct appeal would result *693 in manifest injustice to the people of this state because it would perpetuate a rule which we have now determined to be an undue restriction of legitimate law enforcement activity." Id. This Court refused to retroactively reinstate Owen's prior conviction, but instead noted: "With respect to this issue, Owen stands in the same position as any other defendant who has been charged with murder but who has not yet been tried. Just as it would be in the case of any other defendant, the admissibility of Owen's confession in his new trial will be subject to the Davis rationale that we adopt in this opinion." Id.
Owen's final two prior appearances before this Court pertained to the Worden murder. In 2000, this Court denied Owen's rule 3.850 postconviction motion in that case. See Owen v. State, 773 So.2d 510 (Fla.2000). Owen then filed a successive 3.850 motion, which was denied by the trial court. On July 11, 2003, we affirmed the trial court's denial of postconviction relief, and also denied Owen's petition for a writ of habeas corpus. See Owen v. Crosby, 854 So.2d 182, (Fla.2003).
Now before this Court on a direct challenge of his conviction and sentence of death for the murder of Karen Slattery, Owen raises seven claims on appeal: (1) the trial court erred in failing to suppress Owen's confession on the basis of voluntariness; (2) the trial court erred in failing to suppress Owen's confession because Owen made an unequivocal invocation of his right to remain silent which was ignored by the law enforcement officers questioning him; (3) the trial court improperly applied the aggravating factor of heinous, atrocious, or cruel (HAC); (4) the trial court improperly applied the aggravating factor of cold, calculated, and premeditated (CCP); (5) the sentence of death is disproportionate; (6) Florida's death penalty statute is unconstitutional; and (7) the aggravating factor of murder in the course of a specified felony is unconstitutional. As is more fully addressed below, all of Owen's claims are without merit, and, therefore, we affirm the conviction and sentence of death.

MOTION TO SUPPRESS VOLUNTARINESS
Owen's first claim is that his confession to the Slattery murder, given in 1984, was involuntary and, therefore, the trial court erred in denying his pretrial motion to suppress his confession. Following Owen's first conviction and sentence of death for the Slattery murder, we addressed Owen's argument that his confession should have been suppressed because he asserted that he was coerced into making the inculpatory statements. See Owen, 560 So.2d at 210. There, we concluded:
Owen's more serious argument is that he was psychologically coerced into confessing by extended interrogation sessions, feigned empathy, flattery, and lengthy discourse by the police. These interrogation sessions were videotaped and we have, as did the trial judge, the benefit of actually viewing and hearing them. It is clear from these tapes that the sessions were initiated by Owen, who was repeatedly advised of his rights to counsel and to remain silent. Moreover, he acknowledged on the tapes that he was completely familiar with his Miranda rights and knew them as well as the police officers. It is also clear that the sessions, which encompassed six days, were not individually lengthy and that Owen was given refreshments, food, and breaks during the sessions. The tapes show that the confession was entirely voluntary under the fifth amendment and that no improper coercion was employed. *694 Id. (emphasis supplied). Clearly, when we were first presented with the review of the voluntariness of Owen's confession, we determined that the law enforcement officers who interviewed Owen did not employ improper means to obtain the confession. Despite that holding, Owen is once again before us arguing that his confession was coerced.
We first note that the law of the case doctrine is controlling here. As we have explained:
Generally, under the doctrine of the law of the case, "all questions of law which have been decided by the highest appellate court become the law of the case which must be followed in subsequent proceedings, both in the lower and appellate courts." Brunner Enters., Inc. v. Department of Revenue, 452 So.2d 550, 552 (Fla.1984). However, the doctrine is not an absolute mandate, but rather a self-imposed restraint that courts abide by to promote finality and efficiency in the judicial process and prevent relitigation of the same issue in a case. This Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become the law of the case.
Owen, 696 So.2d at 720 (citation omitted). As he did in 1990, Owen is continuing to argue that law enforcement officers improperly coerced him into confessing to the Slattery homicide. While it is clearly within our province to reevaluate our original 1990 holding as to the voluntariness of Owen's confession, Owen has not presented any new evidence to justify reviewing the issue again. He has failed to provide this Court with any "exceptional circumstances" to warrant a new review. It is clear that he is simply attempting to relitigate the same issue. The trial court's denial of Owen's motion to suppress would be proper even if the denial were based only upon this principle of law.
However, we emphasize that even if the law of the case doctrine had no application here, Owen's confession would still be admissible as voluntary. The record is clear that the trial court did not simply rely upon our 1990 decision when it determined that Owen's confession was admissible. Instead, the trial judge conducted an extensive de novo hearing on Owen's motion to suppress, allowed Owen the opportunity to present any evidence he wished to support his claim, and then completely reevaluated all of the evidence prior to reaching his decision. At the conclusion of the lengthy hearing, the judge ruled, based upon all of the available evidence, that Owen's confession was voluntarily given.
In his oral pronouncement denying Owen's motion to suppress the trial judge stated:
The Court is going to rule as follows: First of all, procedurally, there's no question that the defendant in this case was Mirandized, procedurally, I think the testimony was fifteen times or something to that effect. The videos that I viewed, the twenty-two hours and the testimony in support of that shows extensive Mirandization of the defendant. The Court has listened to, I think the record is clear, to all of the videotaped statements, which ran twenty-one or twenty-two hours as did apparently the Florida Supreme Court.
In reviewing those taped statements which apparently the Florida Supreme Court reviewed and found to be voluntary statements, the Court also is taking into consideration now those matters that are not specifically on the tapes themselves that were testified and argued *695 about and looking at the case law and police techniques in obtaining confessions or statements, this Court will find that the statements by the defendant were, in fact, voluntarily given after proper procedurally [sic] Miranda rights were given. And I think the totality of the circumstances also supports that.
Clearly, the trial judge did not rely solely upon our 1990 decision regarding the voluntariness of Owen's confession. The judge's ruling demonstrates that while he considered the impact of our ruling, he also personally viewed all of the videotapes, analyzed the relevant case law, and evaluated the extensive testimony presented during the hearing on the motion to suppress. Having considered the totality of the circumstances, and not just the law of the case, the judge determined Owen's confession was admissible as voluntary. The trial court's ruling was not in error.
We have held that "[i]n reviewing a trial court's ruling on a motion to suppress, appellate courts must accord a presumption of correctness to the trial court's determination of the historical facts, but must independently review mixed questions of law and fact that ultimately determine the constitutional issues." Moody v. State, 842 So.2d 754, 758 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 181, 157 L.Ed.2d 252, 2003 WL 21490026 (U.S. Oct. 6, 2003); see also Connor v. State, 803 So.2d 598, 608 (Fla.2001). Additionally, we have stated:
To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any direct promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to his true position, and exert an improper and undue influence over his mind.

Simon v. State, 5 Fla. 285, 296 (1853). The test thus is one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession.
Traylor v. State, 596 So.2d 957, 964 (Fla. 1992). A review of the totality of the circumstances here, namely the evidence and testimony presented during the motion to suppress hearing, confirms the propriety of the trial court's ruling. Owen was not threatened or coerced into confessing, nor did the officers questioning him make any promises in exchange for his confession, as Owen asserts.
Owen's testimony during the motion to suppress hearing alone supports the conclusion that the officers did not employ improper methods to obtain a statement from him. On direct examination, Owen acknowledged that the officers had told him on several occasions they could not make any promises, yet he asserted that he subjectively believed they could help him. Further, on cross-examination, Owen stated that he was advised of his constitutional rights perhaps fifteen to twenty times over the course of the interrogations. He admitted that he never asserted his right to remain silent at the time he was read his rights, and never invoked his right to an attorney. In fact, when asked, "And you wanted to talk to the detectives and that's why you never invoked your right to remain silent or for an attorney; isn't that true?" Owen responded, "Absolutely." Owen also testified that during the 1984 questioning, Officer Wood, one of the law enforcement officers conducting the interrogations, never *696 promised Owen that he would help him locate a doctor if he confessed. Additionally, Owen conceded that he knew Wood did not have the authority to make any deals with him. Owen also acknowledged that the officers never promised him that if he confessed he would be able to see a doctor or go to a hospital, although he argued that he felt it was indirectly implied.
Analysis of the transcripts of the interrogation videotapes provides additional support for the trial court's denial of the motion to suppress. Owen was read his constitutional rights numerous times, and each time he indicated that he understood them. Although Officer McCoy, another law enforcement officer who interviewed Owen, told Owen that he would be able to obtain medical help for his mental health issues through the court system, it was clear that Owen understood that McCoy could not make him any promises. Owen himself said to McCoy, "But still, like I said, you can't guarantee me nothing. You can't make any promises." On several subsequent occasions, Owen was told by the officers conducting the interviews that no promises or guarantees could be made.
At one point during questioning on June 7, 1984, Owen proposed a dealif McCoy arranged for a visit between Owen and his brother, Owen would tell McCoy everything he wanted to know (pertaining to the Worden murder). Later that same day, McCoy again brought up the subject of the Worden murder, but Owen deflected the questioning and said he wanted to wait because they had a bargain. McCoy quickly clarified that they did not have a bargain. The record reflects that McCoy did tell Owen that he would bring Owen's brother to see him the following day. However, it is important to note that a confession was not evoked at that time. The following day, on June 8, Owen's brother was brought to visit with him. Prior to the meeting between the brothers, Wood made reference to the bargain Owen had made the previous day when he said to Owen, "Is that what your deal was?" Later that day, McCoy also made reference to the agreement when he said to Owen, "You made a deal yesterday. I kept my half of the bargain. You can keep yours." Owen maintains that these statements support his contention that the officers made promises in exchange for his confession. However, Owen ignores the fact that it was he who initially offered the bargain, and that he did not confess after his brother was brought to him on June 8. In fact, it was not until three weeks later on June 21 that Owen confessed to the Slattery murder, totally unrelated to any alleged "bargain." Additionally, any inference of a deal between Owen and McCoy pertained to the Worden murder, not in any way to the Slattery murder.
Finally, a thorough reading of the transcript reveals no instances of threats or improper coercion by the officers. Owen was made fully aware of his constitutional rights, and knowingly and voluntarily confessed to the Slattery homicide on June 21, 1984. Clearly, based upon the evidence presented during the motion to suppress hearing, and the entire record of this case, Owen's confession was unquestionably voluntary, and, therefore, the trial court properly denied Owen's motion to suppress based upon this issue.

MOTION TO SUPPRESSVIOLATION OF RIGHT TO REMAIN SILENT
Owen next claims that the trial court should have suppressed his confession because the law enforcement officers questioning him violated his right to remain silent when they failed to terminate the interrogation after Owen replied to certain questions with the answers "I don't *697 want to talk about it" and "I'd rather not talk about it."[6] Owen maintains that his responses were unequivocal invocations of his right to remain silent, and therefore questioning should have ceased as a result of his answers. Because we have, on numerous occasions, deemed Owen's responses to be equivocal, the trial court properly rejected Owen's motion to suppress based upon this claim as well.
As with the voluntariness issue, the trial judge could have simply relied upon the law of the case doctrine when deciding this issue. Instead, the record reflects that the judge elected to permit extensive arguments from both parties, and allowed the defendant to present any testimony and evidence he wished to support his claim that his statements were unequivocal. While the trial judge again properly considered the impact of our prior holdings on this issue, it is clear he made his own independent determination that Owen's statements were equivocal. This determination was proper and fully supported by competent, substantial evidence.
In our original decision concerning the first direct appeal, we reversed Owen's conviction based upon the law enforcement officers' failure to stop questioning Owen after he provided the ambiguous responses. See Owen, 560 So.2d at 211. There, we held that the continued questioning violated Owen's Miranda right to terminate questioning. See id. Notably, however, we determined, "The responses were, at the least, an equivocal invocation...." Id. Subsequently, following the United States Supreme Court's decision in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994),[7] we receded from our 1990 opinion, and in 1997, held that in Florida, law enforcement officers have no duty to terminate questioning, or limit themselves to asking only clarifying questions, when a suspect makes an equivocal invocation of a Miranda right. See Owen, 696 So.2d at 719. There, we specifically stated that "Owen's responses were equivocal." Id. at 720. Further, we rejected Owen's argument that because we had originally referred to his statements as "at the least equivocal" they should be considered unequivocal. See id. at 720 n. 8. In addition to those two opinions, in which we characterized Owen's responses as equivocal, we have, in numerous other opinions, made reference to Owen's responses as exemplars of "equivocal utterances." See, e.g., State v. Glatzmayer, 789 So.2d 297, 302 (Fla.2001); Almeida v. State, 737 So.2d 520, 523 (Fla.1999); Almeida v. State, 748 So.2d 922, 930 (Fla. 1999); Owen v. State, 596 So.2d 985, 987 n. 3 (Fla.1992). Clearly, we have concluded that Owen's statements were equivocal responses in context and under the circumstances presented. Owen did not, during the motion to suppress hearing below, offer any testimony or evidence to contradict our prior determinations. Therefore, under *698 State v. Owen, 696 So.2d 715 (Fla. 1997), the law enforcement officers questioning Owen had no duty to further clarify his equivocal responses in the context presented or terminate the interrogation. The trial court properly denied Owen's motion to suppress.

HAC and CCP
Owen next challenges the trial court's application of the aggravating factors of HAC and CCP. The law is well settled regarding this Court's review of a trial court's finding of an aggravating factor:
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Way v. State, 760 So.2d 903, 918 (Fla.2000) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). Here, Judge Cohen found the State had proven the heinous, atrocious, or cruel aggravating factor beyond a reasonable doubt and applied great weight to that factor. In his sentencing order, Judge Cohen provided the proper analysis regarding the HAC aggravator:
Karen Slattery was stabbed or cut eighteen times. She was alive when all the wounds were inflicted. She was in terror. She undoubtedly had a belief of her impending doom. Her fear and heightened level of anxiety occurred over a period of time. Most important the defendant told Dr. McKinley Cheshire that fear in his victim was necessary. The Defendant stated that causing deliberate pain and fear would increase the flow of female bodily fluids which he needed for himself. The puncturing of Karen Slattery's lung caused her to literally drown in her own blood. She experienced air deprivation. Each of the eighteen cuts, slashes, and/or stab wounds caused pain by penetrating nerve endings in Miss Slattery's body. The crime of murdering Miss Slattery evidenced extreme and outrageous depravity. The Defendant desired to inflict pain and fear on Miss Slattery "to increase the flow of her female bodily fluids which he needed for himself." The Defendant showed an utter indifference to Karen Slattery's suffering. He was conscienceless and pitiless and unnecessarily torturous to Miss Slattery. She had an absolute full knowledge of her impending death with unimaginable fear and anxiety.
This aggravating factor has been proved beyond a reasonable doubt. The Court gives it great weight.
The trial judge's determination of this issue is supported by competent and substantial evidence, and it was not error for the trial court to apply the HAC aggravating factor.
Initially, we note that this Court has consistently upheld the HAC aggravator where the victim has been repeatedly stabbed. See, e.g., Cox v. State, 819 So.2d 705, 720 (Fla.2002), cert. denied, 537 U.S. 1120, 123 S.Ct. 889, 154 L.Ed.2d 799 (2003); Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998); Williamson v. State, 681 So.2d 688, 698 (Fla.1996); Barwick v. State, 660 So.2d 685, 696 (Fla.1995); Finney v. State, 660 So.2d 674, 685 (Fla.1995); Pittman v. State, 646 So.2d 167, 173 (Fla. 1994). Furthermore, we have reasoned that the HAC aggravator is applicable to murders that "evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain *699 or utter indifference to or enjoyment of the suffering of another." Brown v. State, 721 So.2d 274, 277 (Fla.1998) (quoting Shere v. State, 579 So.2d 86, 95 (Fla.1991)). The HAC aggravator focuses on the means and manner in which death is inflicted.
In Finney, this Court upheld the application of the HAC aggravator in circumstances substantially similar to those of the instant case. The victim in Finney suffered thirteen stab wounds to her back. See Finney, 660 So.2d at 677. The medical examiner testified that all but one penetrated her lungs, causing bleeding and a loss of oxygen, which ultimately resulted in death. See id. Additionally, no defensive wounds were found on the body. See id. The medical examiner also testified that the victim was alive throughout the attack, and ultimately died from drowning in her own blood. See id. at 685. He could not say precisely how long the victim lived, but he was certain that she was conscious and able to feel the initial stab wounds. See id.
Here, the medical examiner testified that Slattery suffered eighteen stab woundseight to her upper back, four cutting wounds to the front of her throat, and six stab wounds to her neck. Five of the wounds penetrated her lungs, causing them to collapse, making it impossible for Slattery to breath or speak. She would have experienced "air hunger"the feeling of needing to breathe but not being able to do so. The doctor estimated that Slattery lost nearly her entire blood volume. The result of severe blood loss is shock, an involuntary and uncontrollable condition that causes high anxiety and terror. The doctor explained that pain is a result of the nerve receptors in the skin being injured, and that people can experience a substantial amount of pain without suffering a lethal injury.
Although Slattery did not appear to have any defensive wounds, seven of the stab wounds were lethal and could have produced death. While the medical examiner could not determine which wounds were inflicted first, he believed they were all inflicted in rapid succession, and all while Slattery was alive. The doctor opined that Slattery would have been capable of feeling pain as long as she was conscious, which he estimated would have been for between twenty seconds and two minutes, depending upon which wound was inflicted first. He testified that one minute was a reasonable estimate for how long Slattery remained conscious, as twenty seconds was too short, but two minutes would have been a "little long." During that time she would have felt pain, experiencing the additional stab wounds, would have felt terror and shock, would have been aware of her impending doom, would have become weaker as a result of blood loss, and would have been unable to cry out. Finally, according to the medical examiner, although she may have been dead prior to the occurrence, Slattery was sexually assaulted, and semen was found on both her internal and external genitalia.
In addition to the evidence presented by the medical examiner, the testimony of Owen's own mental health expert supports the finding of HAC. Dr. Frederick Berlin testified that Owen believed that by having sex with a woman he could obtain her bodily fluids, and that this would assist him in his transformation from a male to a female. Owen believed that if he had sex with a woman who was near death, his penis would act as a hose, and her soul would enter his body and they would "become one." Importantly, Owen believed that the more frightened the victim was, the better. This express need to cause his victim extreme fear clearly evinces an utter indifference to his victim's torture. On the basis of the entire record, Owen's killing *700 of Karen Slattery unquestionably satisfies the requirements of HAC.
Owen's challenge to the finding of the CCP aggravator is likewise misplaced. This Court has established a four-part test to determine whether the CCP aggravating factor is justified: (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) the defendant must have had no pretense of moral or legal justification. See Evans v. State, 800 So.2d 182, 192 (Fla.2001).
In 1992, we held that the finding of CCP was properly applied to the murder of Georgianna Worden, a second murder for which Owen was convicted and sentenced to death. See Owen, 596 So.2d at 990. Although Worden was bludgeoned to death and not stabbed, the remaining facts of that murder were virtually identical to those of the Slattery homicide. In affirming the application of the CCP aggravator in the Worden opinion, we held:
The [trial] court's finding that the murder was committed in a cold, calculated, and premeditated manner was also adequately established. Owen selected the victim, removed his own outer garments to prevent them from being soiled by blood, placed socks on his hands, broke into the home, closed and blocked the door to the children's room, selected a hammer and knife from the kitchen, and bludgeoned the sleeping victim before strangling and sexually assaulting her.
Id.
Owen's confession to the Slattery murder demonstrates the similarities between the two murders. Owen admitted to cutting a screen out of a window to gain access to the home where Slattery was babysitting. The first time he entered the home, he heard noises and observed Slattery fixing the hair of one of her charges. Owen left the home but subsequently returned. Initially, when he returned, he had his socks on his hands, but immediately upon entering the house, he searched a closet in the home and found gloves, which he placed on his hands, returning his socks to his feet. He also retrieved a hammer from the same closet.
According to Owen, he confronted Slattery near the phone as she was concluding a telephone conversation. He ordered her to return the phone to its cradle, and when she did not, he dropped his hammer, grabbed the phone from her hand, returned it to its base, and immediately began stabbing her. After Owen had stabbed Slattery, he checked on the children to ensure they had not awakened during the attack, and he then proceeded to lock the doors and turn off all the lights and the television. Owen then dragged Slattery by her feet into the bedroom, removed her clothes, and sexually assaulted her. He explained to the officer questioning him that he had only worn a pair of "short-shorts" into the house. After he sexually assaulted Slattery, Owen showered to wash the blood from his body, and then exited the house through a sliding glass door. He then returned to the home where he was staying and turned the clocks back to read 9:00 p.m. According to Owen, he did this to provide an alibi based on time. He admitted that after he turned the clocks back, he purposely asked his roommate the time. Owen bragged to the officers about his plan to turn back the clocks, explaining that he "had to be thinking."
Clearly, as with the Worden murder, the murder of Karen Slattery satisfies the requirements *701 of CCP. The fact that Owen stalked Slattery by entering the house, observing her, leaving, and then returning after the children were asleep demonstrates that this murder was the "product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage." Evans, 800 So.2d at 192 (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). Further, Owen unquestionably had "a careful plan or prearranged design to commit murder," id., as evidenced by the fact that he removed his clothing prior to entering the house, wore socks and then gloves on his hands, confronted the fourteen-year-old girl with a hammer in one hand and a knife in the other, and, by his own admission, did not hesitate before stabbing Slattery eighteen times.
The third element of CCP, heightened premeditation, is also supported by competent and substantial evidence. We have previously found the heightened premeditation required to sustain this aggravator to exist where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder. See Alston v. State, 723 So.2d 148, 162 (Fla.1998); Jackson v. State, 704 So.2d 500, 505 (Fla.1997). When Owen first entered the home and saw the fourteen-year-old babysitter styling the hair of one of her charges, he had the opportunity to leave the home and not commit the murder. While he did exit the home at that time, he did not decide against killing Slattery. Instead, he returned a short time later, armed himself, confronted the young girl, and stabbed her eighteen times. Owen clearly entered the home the second time having already planned to commit murder. Heightened premeditation is supported under these facts.
Finally, the appellant unquestionably had no pretense of moral or legal justification. Notably, Owen never even suggested to the officers who questioned him, and to whom he confessed, in 1984 that a mental illness caused him to kill. He did not attempt to justify his actions, as he does in the after-the-fact manner he advances today, by explaining to the officers that he needed a woman's bodily fluids to assist in his transformation from a male to a female. He did not explain or disclose in any way that the more frightened the woman, the more bodily fluids she would secrete, and the more satisfying it would be for him. In fact, during his interrogation, Owen in no way attempted to justify his actions. Also, there is no indication in either of Owen's previous direct appeals to this Court, first for the Slattery murder and then for the Worden murder, that he has ever raised this justification in the past. Although the trial court determined that the statutory mental health mitigators were proven, the court also held that Owen had no pretense of legal or moral justification to rebut the finding of CCP. The trial court's ruling is supported by competent and substantial evidence.
Owen's claim that his mental illness must negate the CCP aggravator is unpersuasive. We have held: "A defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation." Evans, 800 So.2d at 193. Further, Owen's reliance on Barwick v. State, 660 So.2d 685 (Fla.1995), is misplaced. In Barwick, we concluded that the trial court had improperly found CCP to exist because the evidence there did not support the conclusion that the appellant had entered the home of the victim with a "careful plan or prearranged design to kill." 660 So.2d at 696. Instead, the evidence suggested that he intended to rape, rob, and burglarize, and *702 the murder only occurred as an afterthought because the victim was able to remove the appellant's mask and therefore could have identified him. See id. Here, the evidence clearly demonstrates that Owen entered the home where Slattery was babysitting with a definite plan to murder the victim and then sexually abuse the body. CCP was properly applied to the Slattery murder.

SUFFICIENCY OF THE EVIDENCE AND PROPORTIONALITY
Although not challenged by Owen, prior to determining whether the sentence of death is proportionate, this Court must examine the sufficiency of the evidence underlying the conviction. Here, the evidence clearly supports the finding of guilt. At trial, the State presented Owen's videotaped confession, as well as DNA evidence to establish Owen's guilt beyond any doubt. The medical examiner testified that semen was found on Slattery's external genitalia, as well as within her vagina. DNA experts testified that the semen most probably came from Owen, as only 1 out of 690 million Caucasian males would have the same DNA markers. The impressive DNA evidence and Owen's own confession to the murder provide sufficient proof to uphold the adjudication of guilt.
Having determined the legitimacy of the conviction, we turn next to the sentence of death. It is well settled that the purpose of our proportionality review is to "foster uniformity in death-penalty law." Ocha v. State, 826 So.2d 956, 965 (Fla.2002) (quoting Tillman v. State, 591 So.2d 167, 169 (Fla.1992)). Further, the number of aggravating factors cannot simply be compared to the number of mitigating factors, rather there must be "a thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases." Id. (quoting Beasley v. State, 774 So.2d 649, 673 (Fla.2000)). When compared to other decisions of this Court, the death sentence entered in this case is proportionate.
Initially, Owen argues that the trial court afforded too much weight to the aggravating factors of prior violent felony and commission in the course of a burglary.[8] He asserts that in light of the trial court's determination that the statutory mental health mitigators were proven, these two aggravators should have been afforded less weight. This argument is without merit. Judge Cohen supported all of his findings regarding the aggravators with facts, and the clear and definite evidence confirms his rulings. Each aggravating factor is supported by competent, substantial evidence, and there is nothing to suggest he abused his discretion in determining the weight that should be given to each aggravator. See Sexton v. State, 775 So.2d 923, 934 (Fla.2000) (holding abuse of discretion standard applicable in determining if trial court afforded proper weight to aggravating factor).
Notably, in his sentencing order, the trial judge explained that Owen had conceded the existence of both the prior violent felony aggravator and the commission in the course of a burglary aggravator. The judge determined that both aggravators had been "proven beyond all doubt, a standard higher than beyond a reasonable doubt." Also, although Owen was found guilty of attempted sexual battery, in the trial court Owen challenged the application of the aggravating factor that "the crime for which the defendant is to be sentenced was committed while he was engaged in the commission of or an attempt to commit or flight after committing or attempting to *703 commit the crime of sexual battery." When faced with the challenge asserted by Owen, and despite the adjudication of guilt for attempted sexual battery, the trial court determined it would not consider that aggravating factor. Clearly, Judge Cohen did not abuse his discretion in determining the weight to be given each aggravator. Irrespective of the mental health mitigators, the circuit court applied proper weight to these aggravating factors.
Here, the trial court properly found four aggravating factors applied to the murder of Karen Slattery. This Court has held that both HAC and CCP are "two of the most serious aggravators set out in the statutory scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). Further, the trial court found three statutory mitigators and sixteen nonstatutory mitigators. In comparison to other cases decided by this Court, the death penalty is proportional for the murder of Karen Slattery. In Robinson v. State, 761 So.2d 269 (Fla.1999), we upheld the death penalty in a case involving a bludgeoning murder, where the trial court found three aggravating factors, including CCP, two statutory mitigating factors, and eighteen nonstatutory mitigators. The two statutory mitigating factors applied there were that the appellant suffered from extreme emotional distress and that his ability to conform his conduct to the requirements of law was substantially impaired due to a history of excessive drug use. See id. at 273. Similarly, in Booker v. State, 773 So.2d 1079 (Fla.2000), we determined the death penalty was proportionate in a case where the trial court applied four aggravating factors, including HAC, two statutory mitigating circumstances, and nine nonstatutory mitigators. The two statutory mitigating factors were that the crime was committed while under the influence of extreme mental or emotional disturbance and the appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. See id. at 1091 n. 15; see also Singleton v. State, 783 So.2d 970, 972-73 (Fla.2001) (upholding death penalty in stabbing death where trial court found two aggravators, including HAC, three statutory mitigators, and nine nonstatutory mitigators); Spencer v. State, 691 So.2d 1062, 1063 (Fla.1996) (upholding death penalty where trial court applied two aggravating factors, including HAC, two statutory mental health mitigating factors, and a number of nonstatutory mitigators, including paranoid personality disorder, sexual abuse, and an honorable military record).
Clearly, when the facts and circumstances in this case are compared with our prior decisions, the inescapable conclusion is that death is a proportionate penalty for the murder of fourteen-year-old Karen Slattery.

CONSTITUTIONAL VALIDITY OF FLORIDA'S DEATH PENALTY SCHEME
Owen next challenges the constitutional validity of Florida's death penalty scheme. We recently addressed Owen's contention that the Florida death penalty scheme is unconstitutional in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. Owen is likewise not entitled to relief on this claim. Further, Owen's specific argument that his death sentence was unconstitutionally imposed because Florida's capital sentencing scheme fails to require that aggravating circumstances be enumerated and charged in the indictment and by further failing to *704 require specific, unanimous jury findings of aggravating circumstances is unquestionably without merit. Recently, in Doorbal v. State, 837 So.2d 940 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003), we held, "Because [the prior violent felonies] were charged by indictment, and a jury unanimously found Doorbal guilty of them, the prior violent felony aggravator alone clearly satisfies the mandates of the United States and Florida Constitutions, and therefore imposition of the death penalty was constitutional." Id. at 963. As in Doorbal, the death penalty was constitutionally imposed upon Owen in light of the fact that the trial court properly applied the prior violent felony aggravating factor. Notably, the trial court highlighted the fact that Owen conceded that the prior violent felony aggravator was applicable in his case.
Owen's final argument is that the murder in the course of a felony aggravating factor is unconstitutional. We have repeatedly rejected this contention. See Johnson v. Moore, 837 So.2d 343, 348 (Fla. 2002); Blanco v. State, 706 So.2d 7, 11 (Fla.1997). In Blanco, we wrote:
Eligibility for this aggravating circumstance is not automatic: [t]he list of enumerated felonies in the provision defining felony murder is larger than the list of enumerated felonies in the provision defining the aggravating circumstance of commission during the course of an enumerated felony. A person can commit felony murder via trafficking, carjacking, aggravated stalking, or unlawful distribution, and yet be ineligible for this particular aggravating circumstance. This scheme thus narrows the class of death-eligible defendants. 706 So.2d at 11 (footnotes omitted).

CONCLUSION
Based upon the foregoing, we find no reason to reverse the appellant's conviction and sentence of death for the murder of Karen Slattery. We therefore affirm the judgment and sentence imposed by the circuit court below.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., specially concurring.
I concur with the reasoning of the majority in all respects, except for its discussion of the Ring issue.
PARIENTE, J., specially concurring.
I concur fully in the majority opinion except for a portion of its Apprendi/Ring analysis. Because Bottoson and King were postconviction cases without majority opinions, I would not rely on the decisions in those cases for rejection of Owen's constitutional claim in this direct appeal. As in other direct appeals, I would rely solely on the prior-conviction aggravator for rejection of Owen's challenge under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). See Duest v. State, 855 So.2d 33, 50 (Fla.2003) (Pariente, J., concurring specially); Doorbal, 837 So.2d at 964 (Pariente, J., concurring as to the conviction and concurring in result only as to the sentence).
NOTES
[1] The facts of Karen Slattery's murder and Owen's subsequent confession were fully outlined in our 1990 opinion. See Owen, 560 So.2d at 209.
[2] Owen was also adjudicated guilty of attempted sexual battery, for which he received a fifteen-year sentence, and burglary, for which the judge imposed a life sentence. Because Owen does not challenge the findings of guilt or sentences imposed for these crimes, they are not addressed further.
[3] The sixteen nonstatutory mitigating factors were: (1) the defendant was raised by alcoholic parents (some weight); (2) the defendant was raised in an environment of sexual and physical violence (some weight); (3) the defendant was a victim of physical and sexual violence (some weight); (4) the defendant was abandoned by the deaths of his parents and abandoned by other family members (some weight); (5) the defendant has a mental disturbance and his ability to conform his conduct to the requirements of law was impaired (some weight); (6) the defendant was cooperative in court and not disruptive during court proceedings (little weight); (7) the defendant has made a good adjustment to incarceration and will be a good prisoner (little weight); (8) the offense for which the defendant was to be sentenced happened fifteen years ago (little weight); (9) the defendant will never be released from prison if given life sentences without parole (minimal weight); (10) the defendant cooperated with law enforcement (little weight); (11) the defendant obtained a high school equivalency diploma (little weight); (12) the defendant received a general discharge under honorable conditions from the United States Army (little weight); (13) the defendant saved a life in his youth (little weight); (14) the defendant suffered from organic brain damage (some weight); (15) the defendant lived in an abusive orphanage (some weight); and (16) any other circumstances of the offense (some weight). As to this final nonstatutory mitigating factor, the trial court considered the fact that Owen did not harm the two young children that Karen Slattery was babysitting at the time of her murder, nor did he harm Georgianna Worden's two young children who were present in her home at the time of her murder.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] In Traylor, this Court specifically stated: "Under Section 9 [of the Florida Constitution], if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop." Traylor v. State, 596 So.2d 957, 966 (Fla. 1992).
[6] Owen's ambiguous responses came on June 21, 1984, when he was being questioned by Officers Lincoln and Wood about the Slattery homicide. Owen had not yet confessed at the time he made the statements. Lincoln asked Owen, "There's a few things that I have to know, Duane. A couple pieces don't fit. How did it come down? Were you looking at the particular house or just going through the neighborhood?" Owen's response was, "I'd rather not talk about it." A short time later, following additional questions and answers, Lincoln asked, "Now, did you have a bicycle? Of course you did. Now, where did you put it?" Owen answered, "I don't want to talk about it."
[7] Davis held that neither Miranda nor its progeny require police officers to stop interrogation when a suspect in custody, who has made a knowing and voluntary waiver of his or her Miranda rights, thereafter makes an equivocal or ambiguous request for counsel. See 512 U.S. at 459, 114 S.Ct. 2350.
[8] The trial court applied "great weight" to both of these aggravating factors.