PER CURIAM.
Cornelius Baker appeals from a judgment of conviction of first-degree murder and a sentence of death. Baker was also convicted of home invasion robbery with a firearm, for which he was sentenced to life imprisonment; kidnapping, for which he was also sentenced to life imprisonment; and aggravated fleeing and eluding a law enforcement officer, for which he was sentenced to fifteen years in prison. The convictions and sentences were based on the January 2007 robbery, kidnapping, and murder of Elizabeth Uptagrafft. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm the convictions and sentences.
FACTS AND PROCEDURAL HISTORY
Background
At the time of the offenses, Baker was living in Daytona Beach, Florida, with his girlfriend, Patricia Roosa. Baker had recently been released from jail, where he had been incarcerated for several months for selling drugs. Baker and Roosa decided that they wanted to move to New York. To get extra money for their move, they decided to rob a house using a pistol that Baker had recently stolen. On the morning of January 7, 2007, they walked around a Daytona Beach neighborhood until they found a house they could rob. Baker later told police that he and Roosa selected the Uptagrafft residence because it looked nice and they thought there might be money inside. Baker and Roosa walked to the front door. Baker told Roosa to ring the doorbell and that he would do the rest.
Inside the house, Elizabeth Uptagrafft and her mother, Charlene Burns, had just finished eating breakfast. The only occupants of the house at the time were Elizabeth, Burns, and Elizabeth’s adult son Joel Uptagrafft. Burns later stated that she thought they finished eating at approximately 8:30 or 9:00 a.m., and that Joel was still asleep at that time. After breakfast, Burns went to her bedroom to take a nap, while Elizabeth sat down on the couch in the living room to read. The doorbell rang a few moments later. When Elizabeth opened it, Baker came through the door and immediately hit her with his gun. The gun discharged and the bullet grazed Elizabeth’s head.
At trial, Burns testified that she heard a noise that sounded like someone kicking in the door, followed by a gunshot. Burns stated that after she entered the hallway outside her room that was connected to the living room, she was attacked by Baker, who beat, choked and kicked her. Burns *809 said that Baker then told her to sit on the couch next to Elizabeth. When Burns saw Elizabeth’s head wound, she yelled for her grandson, Joel. Joel came out of his room and was attacked by Baker, who beat Joel with the gun.
Burns estimated that the family was held at gunpoint for between two-and-a-half and three hours while Baker and Roo-sa searched the house for valuables. Burns stated that there was no money in the house, but said that Baker and Roosa found some jewelry and placed it in a bag. Elizabeth eventually offered Baker her ATM card and PIN code if they would leave. Baker did not believe that the PIN was real and told Elizabeth that she would have to come with them. According to Burns, Baker then said that if Elizabeth did not come with him, he would kill all three members of the family. Because Elizabeth was covered in blood from her head wound, Baker told her that she would have to change clothes before they left. Baker also told her to find a hat to cover the wound. Baker collected Elizabeth’s cell phone and all other phones in the house. Before she left the house, Elizabeth whispered to her mother to call the police once Baker and Roosa were gone. Baker then placed Elizabeth, the phones, and the stolen jewelry into Elizabeth’s car, and he and Roosa drove away from the house. Joel then walked to a neighbor’s house and called the police.
Baker became nervous due to the number of police officers he saw in Daytona Beach, so he decided to drive to Flagler County to find an ATM. He later told police that his plan was to get the money and then to let Elizabeth go. While they were driving, Elizabeth asked for cigarettes and Baker gave them to her. She asked if Baker was going to let her live and he told her he was. At one point, Baker decided that he wanted to buy drugs. He drove to a house where he thought he could buy marijuana. However, Baker saw other people at the house and became afraid that someone would see Elizabeth in the car. He stated that he drove away without going inside. Baker drove to a Winn-Dixie to try to get money from an ATM using Elizabeth’s card. Roosa went into the store while Baker and Elizabeth waited in the car. When Roosa was unable to withdraw money from the Winn-Dixie ATM, she tried using an ATM at a nearby SunTrust Bank.
Finally, Baker decided to drive to a rural area of Flagler County known as the Mondex. Baker told police that it was his intention to drop Elizabeth off in a remote area where it would take her some time to find a phone' that she could use to call the police. When they arrived at a spot that Baker thought was sufficiently isolated, Baker told Elizabeth to get out of the car, which she did. He also told her that she was going to live. According to Baker’s statement to police, he then drove approximately fifteen feet before stopping the car and getting out. Baker said that Roosa told him, “Don’t do it. Don’t do it.” Baker told the officers, “I felt like I done came this far.” Baker said that Elizabeth started to run and that he ran after her. She ran into some nearby bushes, then tripped and fell. Baker fired two shots at her. He then went back to the car and drove away.
Detective Dale Detter, a homicide investigator with the Daytona Beach Police Department, was investigating another case when he was informed that a home invasion robbery and kidnapping had just occurred at a house on Michigan Avenue in Daytona Beach. After Detective Detter and other officers arrived at the house, they learned that Elizabeth Uptagrafft had been abducted, and that the abductors had taken her car and Bank of America ATM card. They also learned from Charlene *810 Burns that the abductors had been given Elizabeth’s PIN. Police put out a statewide be-on-the-lookout alert (BOLO) with details of the vehicle, Elizabeth’s description, and specific instructions that officers should look for the abductors at Bank of America locations or ATMs.
At approximately 1:45 p.m., police officers received a call from Bank of America informing them that Elizabeth’s ATM card had been used recently at two locations in Flagler County, first at a Winn-Dixie grocery store and then at a SunTrust bank. Sergeant Randy Burke of the Bunnell Police Department was on duty as a road patrol supervisor when the BOLO went out shortly after 2:00 pm. The alert described the color, features and tag of the vehicle, advised that there were two occupants, a black male and a black female, and stated that the victim’s debit card had been used recently near the intersection of 1-95 and State Road 100. The alert stated that the victim might be in the vehicle as well.
As the BOLO was still going out, Sergeant Burke observed a vehicle parked in an alleyway that matched the description of the one given in the alert. Sergeant Burke pulled closer and verified that the license plate number was the one described in the alert. As Sergeant Burke moved closer, the vehicle began to pull out of the alley and onto the street. Sergeant Burke called for backup and attempted to initiate a traffic stop. The vehicle began to flee when Sergeant Burke activated his lights and sirens. A high-speed chase began through a residential area, with the pursued vehicle, driven by Baker, travel-ling at more than 75 miles per hour while weaving around persons and other vehicles.
Eventually, Baker’s vehicle crashed into a fence and came to a stop. Baker got out of the car and fled through a gate in the fence. Sergeant Burke was unable to apprehend Baker at that time, but took Roo-sa into custody. He then conducted a search of the vehicle. In the front seat he observed a hat with blood on it, two portable house phones, several spent shell casings, and one unfired bullet. Sergeant Burke directed other officers to set up a perimeter. Shortly thereafter, officers discovered Baker hiding in a nearby house. Baker later stated that after he ran from Officer Burke he threw the gun away in a field.
Baker was taken to the Flagler County Sheriffs Office, where he was interviewed by Sergeant Jakari Young, a homicide investigator with the Daytona Beach Police Department, and Detective Daniel Diaz. After Baker was given Miranda[1] warnings, Sergeant Young asked Baker where they could find Elizabeth Uptagrafft. Baker first said that Patricia Roosa had nothing to do with what had happened. He then stated:
Only thing I care about in life, I care about my daughter, and I really care about my — my girlfriend.... [I]f I can just get to kiss my girlfriend, and I swear to God, I tell you [sic] anything you want to know. And I tell you where to find the lady, and I show you where to find the lady. Do that, I’ll even sing for you.
Detective Diaz asked if Elizabeth was okay. Baker responded, “She might be a little hurt.” The officers eventually agreed that Baker would be allowed to see Roosa if he agreed to tell them where they could find Elizabeth. Baker told them that she was in the Mondex and that he did not know whether she was still alive. Baker admitted that she was first injured at the house when he hit her with a pistol and the pistol fired. Baker also explained *811 how the robbery occurred, where he and Roosa went after they kidnapped Elizabeth, how he threw away the gun after leaving Elizabeth in the Mondex, and how he hid after being identified and chased by police. Baker also described how he shot Elizabeth after letting her out of the car. During the course of the interrogation, other officers entered the room with a map and Baker showed them where they could find Elizabeth. The interrogation ended when Baker said that he did not want to talk anymore. Shortly thereafter, Roosa was brought into the room and Baker was allowed to speak with her. Baker then rode with officers to the Mondex, where Elizabeth’s body was discovered.
On January 19, 2007, Baker and Roosa were jointly indicted by a grand jury for the offenses of first-degree murder,[2] home invasion robbery with a firearm, kidnapping, conspiracy, and burglary of a structure or conveyance. Baker was also indicted for aggravated fleeing and eluding a law enforcement officer.
Guilt Phase
The guilt phase of Baker’s trial began on August 20, 2008. The trial was held in the Seventh Judicial Circuit in Flagler County. As its first witness, the State called Charlene Burns, who described her memories of the robbery and identified Baker as the person who committed the acts. The State also called several police officers to testify regarding Baker’s pursuit, capture, and interrogation. Among these witnesses was Sergeant Young, who identified the recording of Baker’s interrogation, which was played to the jury.
The State called other witnesses to describe physical evidence recovered in the investigation. One of the State’s forensic witnesses was Dr. Terrance Steiner, who was admitted as an expert in forensic pathology. Dr. Steiner stated that he performed the autopsy on Elizabeth Upta-grafft’s body. In his testimony, Dr. Steiner first described a graze injury on the left side of the victim’s head, then described a second injury in which a bullet had entered the left side of her neck, travelled almost straight down through her chest fracturing three ribs, then exited at the left side of her lower back. Dr. Steiner stated that both wounds had resulted in bruising and bleeding, indicating that the victim was alive when they were inflicted. Additionally, a third gunshot wound had been inflicted to the left side of Elizabeth’s forehead. Dr. Steiner noted that red and black specks were present in a four-inch area surrounding the gunshot wound. He stated that these specks were caused by “stippling,” which occurs when unburnt gunpowder is driven into the skin due to the proximity of the gunshot. Based on the presence of stippling, Dr. Steiner concluded that the gunshot was delivered within eighteen inches of the victim’s forehead. Dr. Steiner stated that the gunshot wound to the forehead would have been immediately fatal, and that because the other wounds showed vital reaction, it would have been the last of the three wounds to have been inflicted.
At the end of the guilt phase, the jury returned a verdict finding Baker guilty of one count each of first-degree murder, home invasion robbery, kidnapping, and aggravated fleeing and eluding a law enforcement officer.
Penalty Phase
In the penalty phase of the trial, the State presented two victim impact statements. The first statement was written by Charlene Burns and was read in court by Brenda Gillespie, Elizabeth Upta- *812 grafft’s sister. The second statement was written jointly by Elizabeth’s four children and was read in court by Elizabeth’s son Joel. The State presented no additional penalty phase testimony.
The first defense witness was Dr. Harry Krop, a psychologist. Dr. Krop testified that Baker was one of four siblings and that Baker’s parents were neglectful and physically abusive toward their children. Baker’s mother used alcohol and drugs during her pregnancy, while Baker’s father was sent to prison while Baker was young. Dr. Krop said that according to Baker’s older brother, the children were often unsupervised and began engaging in criminal activity at a young age to earn money. Dr. Krop stated that Baker began using marijuana at the age of twelve and that he began drinking heavily at the age of sixteen.
With regard to Baker’s mental health history, Dr. Krop testified that Baker was diagnosed with a speech impediment, borderline intellectual ability, and attention deficit hyperactivity disorder when he was seven years old. Dr. Krop stated that his own testing, conducted in 2007, showed that Baker had an IQ of 81. Based on this testing, Dr. Krop estimated that Baker had a mental age of fourteen or fifteen. He also referred Baker for neurological testing. Baker’s MRI was normal, but the results of a PET scan showed deficiencies in the frontal area of his brain. Dr. Krop diagnosed Baker with the following impairments: (1) attention deficit disorder; (2) an unspecified cognitive disorder resulting from frontal lobe impairment; (3) polysub-stance abuse; and (4) antisocial personality disorder. When asked whether he believed Baker qualified for any statutory mitigating circumstances, Dr. Krop responded that he believed Baker was suffering from an extreme mental or emotional disturbance throughout his life and at the time of the offense.
The defense also presented Baker’s mother and two sisters as witnesses. Baker’s mother, Jessica Smith, testified that she drank beer and gin and smoked marijuana while she was pregnant with Baker. Smith described Baker’s speech problems as a child, and stated that he was held back in kindergarten and was placed in special education classes and on Ritalin.
Cornelius Baker testified in his own defense. Baker said that his father was not present when he was a child and that his mother drank and used drugs and often left the children alone. He said that he stuttered as a child, had problems reading, and often got into fights as a result of other children making fun of an eye injury he sustained when he was five years old. Baker also stated that he started drinking and selling cocaine and marijuana at a young age. He met Roosa when they were both in the ninth grade and they later moved in with his mother. In January 2007, he had just been released from the county jail where he had been incarcerated for selling crack cocaine. Baker said that Roosa had recently been fired from her job and they needed money. Regarding the crime itself, Baker said that he was remorseful for what he had done and that he wanted to help the victim’s family by confessing and telling police where they could find the body.
After Baker’s testimony, the defense rested. The jury subsequently returned a recommendation in favor of death by a vote of nine to three.
Spencer Hearing
A Spencer[3] hearing was held on November 21, 2008. The defense introduced records of Baker’s mental health and childhood into the record, including psychiatric *813 evaluations, medical records, and school reports. The court was also given a pre-sentence investigation report (PSI) that was prepared by the Florida Department of Corrections.
During the hearing, the defense played two videos that were taken at the time Elizabeth’s body was discovered by police. In one of the videos, Baker is shown admitting to a television reporter that he committed the murder. When asked whether he wanted to say anything to the victim’s family, Baker responded that he was sorry for what happened. Baker’s two sisters testified again on behalf of the defense. Both described Baker’s difficult childhood and stated that Baker had frequently shown remorse. Baker also testified at the hearing and again expressed remorse for the crime. When asked on cross-examination why he killed Elizabeth, he responded that he “just freaked out.” Patricia Roosa was also called as a witness, and her testimony largely corroborated Baker’s description of the events surrounding the murder. No further witnesses were presented.
Sentencing Order
In the trial court’s sentencing order, the court found that the following aggravating factors had been proven beyond a reasonable doubt: (1) the crime was committed while the defendant was engaged in the commission of, or an attempt to commit, the crime of home invasion robbery or kidnapping; (2) the capital felony was committed for pecuniary gain (great weight);[4] (3) the capital felony was espe-dally heinous, atrocious, or cruel (great weight); and (4) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (great weight).
As statutory mitigation, the court found: (1) the crime was committed while the defendant was under the influence of extreme mental or emotional disturbance (some weight);[5] and (2) the age of the defendant (twenty years old) at the time of the crime (some weight). As nonstatutory mitigation, the court found: (1) the defendant suffers from brain damage, low intellectual functioning, drug abuse and that those factors are compounded by each other (some weight); (2) the defendant was born into an abusive household and was neglected as a child (some weight); (3) the defendant is remorseful (little weight); (4) the defendant was well behaved and displayed appropriate demeanor during all court proceedings (little weight); and (5) the defendant’s confession and cooperation with police (some weight).
The trial court determined that the aggravating circumstances far outweighed the mitigating circumstances and sentenced Baker to death for the charge of first-degree murder. The court also sentenced Baker to life imprisonment for the charge of home invasion robbery with a firearm, life imprisonment for the charge of kidnapping, and fifteen years’ imprisonment for the charge of aggravated fleeing and eluding a law enforcement officer. Baker now appeals, raising various issues.
*814 ISSUES ON APPEAL
Baker’s Post-Arrest Interrogation
As his first issue, Baker argues that the trial court erred in denying his motion to suppress the recording of his post-arrest interrogation. When reviewing a ruling on a motion to suppress a statement that a defendant contends was obtained in violation of his or her constitutional privilege against self-incrimination, this Court accords a presumption of correctness to the trial court’s factual findings, but “independently review[s] mixed questions of law and fact that ultimately determine constitutional issues.” Welch v. State, 992 So.2d 206, 214 (Fla.2008) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)).
Initially, the State argues that this issue has not been preserved for review because, although Baker filed a motion to suppress the statements and a hearing was held on the motion by the trial court, Baker failed to obtain a ruling on the motion. “Absent fundamental error, an appeal may not be taken from a trial court’s judgment or order unless properly preserved. To be preserved, the issue or legal argument must be raised and ruled on by the trial court.” Rhodes v. State, 986 So.2d 501, 513 (Fla.2008) (citation omitted) (citing § 924.051(1)(b), (3), Fla. Stat. (2006)). However, the record here demonstrates that the trial court denied the motion from the bench on several occasions. Thus, the issue is preserved.
Nonetheless, we find that Baker is not entitled to relief on the merits. In examining whether a defendant’s confession may be used as evidence against him, “[t]he test is ... one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession.” Owen v. State, 862 So.2d 687, 695 (Fla.2003) (quoting Traylor v. State, 596 So.2d 957, 964 (Fla.1992)). Moreover, “[t]o establish that a statement is involuntary, there must be a finding of coercive police conduct.” Schoenwetter v. State, 931 So.2d 857, 867 (Fla.2006); see also Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (“Coercive police activity is a necessary predicate to the finding that a confession is not ‘voluntar/ within the meaning of the Due Process Clause of the Fourteenth Amendment.”). “Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.” Connelly, 479 U.S. at 164, 107 S.Ct. 515.
Thus, whether a confession is admissible depends on (1) whether the interrogating officers engaged in coercive activity, and (2) whether that activity was sufficient to overcome the free will of the defendant. See Blake v. State, 972 So.2d 839, 844 (Fla.2007). As this Court long ago stated:
To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any direct promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to his true position, and exert an improper and undue influence over his mind.
Simon v. State, 5 Fla. 285, 296 (1853).
In this case, Baker argues that his confession should have been excluded because the interrogating police officers obtained his confession only by promising that he would be allowed to see his girlfriend if he discussed the crime with them. This Court has held that some promises by law enforcement constitute improper coercion that will result in the exclusion of any *815 subsequent confession. “For example, confessions induced by promises not to prosecute or promises of leniency may render a confession involuntary. Similarly, a confession made in return for a promise of release is involuntary.” Blake, 972 So.2d at 844 (citations omitted).
However, we have also explained that other promises do not affect the voluntariness of a statement:
For example, “[t]he fact that a police officer agrees to make one’s cooperation known to prosecuting authorities and to the court does not render a confession involuntary.” Maqueira v. State, 588 So.2d 221, 223 (Fla.1991). Similarly, “a confession is not rendered inadmissible because the police tell the accused that it would be easier on him if he told the truth.” Bush v. State, 461 So.2d 936, 939 (Fla.1984).
Blake, 972 So.2d at 844. For a promise of leniency to render a confession inadmissible, “Florida courts have repeatedly required that the alleged promise ‘induce,’ be ‘in return for,’ or be a ‘quid pro quo’ for the confession.” Id.
For offers other than offers not to prosecute or offers of leniency, a court must look at the surrounding facts to determine whether, in each particular case, the defendant’s will was overborne. In Blake, for example, the defendant agreed to provide a statement to a police officer, but refused to allow the statement to be taped. Nonetheless, the officer secretly recorded the statement. On appeal, the defendant argued “that by asking him to agree to a taped statement, the detective implicitly promised that his refusal would be honored, rendering the recording involuntary.” Blake, 972 So.2d at 842. Reviewing the surrounding circumstances, this Court concluded that even if the officer had implicitly promised not to tape the defendant without his consent, the totality of the circumstances did not suggest that the promise was coercive or that the defendant’s will had been overcome. We first noted that Blake had been read his Miranda rights. Further, we found “nothing in the demeanor of either Blake or the detectives that suggested] coercive conduct.” Id. at 845. We also observed that “Blake acknowledged that he had been treated well and that he told the truth because it was the right thing to do.” Id.
Another factor that has been considered relevant is whether a deal that resulted in a confession was proposed by the defendant. The North Carolina Supreme Court has held that “where a promise or statement indicating a defendant may receive some form of benefit is made in response to a solicitation by a defendant, the defendant’s confession is not deemed involuntary.” State v. Wallace, 351 N.C. 481, 528 S.E.2d 326, 350 (2000). This Court has similarly found the fact that a deal was proposed by the defendant to be relevant when reviewing the voluntariness of a statement. In Owen, the defendant had informed a police officer that if he were allowed to meet with his (the defendant’s) brother, he would speak with the officer about a murder that was then being investigated. The defendant was later allowed to meet with his brother, at which time the officer said to him, “I kept my half of the bargain. You can keep yours.” Owen, 862 So.2d at 696. Owen later confessed to murder. See id.
On appeal, Owen argued that the promise rendered the confession involuntary. Examining the record, we found that the confession was not in fact the result of that particular deal. However, we also found it relevant that, in making his argument, “Owen ignore[d] the fact that it was he who initially offered the bargain.... ” Id. Ultimately, where “a thorough reading of the transcript reveal[ed] no instances of *816 threats or improper coercion by the officers” and “Owen was made fully aware of his constitutional rights,” we found that “Owen’s confession was unquestionably voluntary.” Id.
In this case, the record demonstrates that Baker’s confession was not the product of improper coercion. First, this was not the type of promise that generally renders a confession involuntary, i.e., a quid pro quo offer not to prosecute or an offer of leniency. See Blake, 972 So.2d at 844. Second, there has been no allegation, and there is no indication in the record, that Baker was threatened or physically mistreated during the interrogation. See id. Third, as discussed above, Baker himself proposed the deal that he would confess if he were allowed to see his girlfriend. See Owen, 862 So.2d at 696.
Furthermore, Baker was not misled as to the results of giving his statement to the officers. Baker had been given Miranda warnings prior to that point in the interrogation. See Blake, 972 So.2d at 845. Baker was also fully aware of the results of his statements. As he acknowledged when he was negotiating with the officers, “If I say it — it come out of my mouth, that mean I’m telling you I did it.” Baker also asked what kind of charges he was facing at several points in the interrogation, and explained that when he shot Elizabeth the first time in the house, he was already aware that he would be facing charges for attempted murder and possession of a firearm.
Overall, the record shows that Baker was not threatened or mistreated, that he was aware of the consequences of his confession, and that the officers merely acquiesced to his request. Thus, the officers did not engage in the type of coercive conduct required to render a confession inadmissible. We conclude that the trial court did not err in admitting the recording of the interrogation at trial.
Letter of Apology
Baker next argues that the trial court erred by refusing to allow him to read a letter of apology during the penalty phase. On cross examination, the State Attorney asked Baker whether he had ever apologized to the family of Elizabeth Uptagrafft. Baker responded that he had not. On redirect, defense counsel asked Baker why he had never apologized. Baker replied that he had never been given the opportunity, but said that he had written a letter that he wanted to read aloud. The State Attorney objected on relevance grounds. The court sustained the objection, but stated that Baker would be permitted to read the letter on the record at a later time.
Generally, a ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion. See Frances v. State, 970 So.2d 806, 813 (Fla.2007). As a threshold matter, however, the State argues that this issue has not been preserved for appellate review because Baker failed to proffer the contents of the statement to the trial court. We agree.
“In order to preserve a claim based on the court’s refusal to admit evidence, the party seeking to admit the evidence must proffer the contents of the excluded evidence to the trial court.” Blackwood v. State, 777 So.2d 399, 410 (Fla.2000). “A proffer is necessary to preserve a claim such as this because an appellate court will not otherwise speculate about the admissibility of such evidence.” Lucas v. State, 568 So.2d 18, 22 (Fla.1990). “Without a proffer it is impossible for the appellate court to determine whether the trial court’s ruling was erroneous and if erroneous what effect the error may have had on the result.” Finney v. State, 660 So.2d 674, 684 (Fla.1995); see also Ketrow v. State, 414 So.2d 298, 299 (Fla. 2d DCA 1982) (explaining that the rule requiring a *817 proffer of proposed evidence “prevents an appellate panel from speculating as to what someone might have said or what some document might have contained, as well as what effect, if any, it may have had on the result”).
Here, Baker’s letter was never proffered to the trial court and no copy of the letter appears in the record. Therefore, the issue is unpreserved.
Victim Impact Statements
Baker next challenges the trial court’s decision to admit two statements by members of Elizabeth Uptagrafft’s family during the penalty phase. Victim impact evidence is, as a general matter, permitted by both the United States and Florida Constitutions. The United States Supreme Court held in Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991):
[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed.
Such evidence is also protected by article I, section 16 of the Florida Constitution, which provides “[vjictims of crime or their lawful representatives, including the next of kin of homicide victims,” with “the right to be informed, to be present, and to be heard when relevant, at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused.”
The admission of victim impact evidence is governed more specifically by section 921.141(7), Florida Statutes (2006), which states:
Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as part of victim impact evidence.
“Victim impact evidence must be limited to that which is relevant as specified in section 921.141(7).” Windom v. State, 656 So.2d 432, 438 (Fla.1995). A trial court’s decision to admit victim impact testimony is reviewed for an abuse of discretion. See Sehoenwetter, 931 So.2d at 869.
On review, we find no error in the admission of either of the two statements. The first statement was written by Elizabeth’s mother, Charlene Burns, while the second statement was written jointly by Elizabeth’s four adult children. Prior to the penalty phase, written copies of each statement were provided to the trial court. The defense proposed that specific portions of each statement be struck by the court. Before the statements were read to the jury, the court accepted some of the defense’s proposed revisions and rejected others.
In the first statement, Burns explained that she had lived with Elizabeth since the death of her (Burns’) husband, that she suffered from health problems, that Elizabeth had been her primary caregiver, and that she now lived with her other daughter and her daughter’s husband. She next described her own emotional suffering caused by the death of her daughter, particularly her fears regarding her own security and sense of personal safety. Finally, Burns discussed Elizabeth’s relationship *818 with her sister and her children and explained how Elizabeth’s death had affected the family. In the second statement, Elizabeth’s children similarly described their relationship with their mother and her impact on each of their lives. The statement described how the children felt orphaned by the loss of their mother and how they would feel her absence at future holidays and family gatherings.
Evidence describing the impact of a victim’s death on members of the victim’s family is appropriate under section 921.141(7):
Clearly, the boundaries of relevance under the statute include evidence concerning the impact to family members. Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family.
Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996). Family members’ emotions resulting from the loss of the victim, including feelings of pain, anger, or fear, are directly related to the family’s affection for the victim and the impact caused by his or her death. See Abdool v. State, 53 So.3d 208, 222 (Fla.2010) (finding that a father’s testimony concerning the close relationship between his son and daughter and his fear that anger and pain would consume his son following his daughter’s death was “directly related to the impact [the victim]’s death had on her family”), petition for cert. filed, No. 10-10531 (U.S. Apr. 25, 2011). Testimony concerning the loss of the victim as a provider or caregiver is similarly appropriate evidence of the impact of the victim’s death. See Franklin v. State, 965 So.2d 79, 97-98 (Fla.2007) (finding no error where a victim impact statement included testimony that the victim’s sister had been living with him at the time of his death and that his death had left her without a home or income).
On review, we find that these statements did not exceed the scope of the victim impact evidence permitted by Florida law. Accordingly, we reject this claim of error.
CCP
Turning to the trial court’s sentencing order, Baker, argues that the trial court erred in finding that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). See § 921.141(5)(i), Fla. Stat. (2006). When this Court evaluates a trial court’s decision finding an aggravating circumstance,
[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job. Rather, our task on appeal is to review the record to determine [1] whether the trial court applied the right rule of law for each aggravating circumstance and, if so, [2] whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnote omitted). “A court must consider the totality of the circumstances when determining whether a murder was [CCP].” McGirth v. State, 48 So.3d 777, 793 (Fla.2010), cert. denied, — U.S. -, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011).
Whether the CCP aggravator applies in a given case is subject to a four-part test:
(1) [T]he killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calcu *819 lated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.
Lynch v. State, 841 So.2d 362, 371 (Fla.2003) (citing Evans v. State, 800 So.2d 182, 192 (Fla.2001)). “The CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant.” Wright v. State, 19 So.3d 277, 298 (Fla.2009).
When the trial court found that the murder in this case was CCP, the court first cited the four factors described by this Court in Lynch. The trial court then stated:
The evidence proves beyond a reasonable doubt that the four-part test has been satisfied: after releasing Elizabeth Uptagrafft, Cornelius Baker returned to the car, spoke briefly to Patricia Roosa, the Co-Defendant, then decided to go back after Elizabeth Uptagrafft. He chased her down and killed her. She was in a remote location unable to summon help, there were two witnesses back at the Holly Hill home who had both seen the Defendants for an extended time, the Defendant had already taken everything he possibly could from Elizabeth Uptagrafft — but her life. This further demonstrates the murder was committed without any pretense of moral or legal justification.
Because the trial court cited the four-part test applied by this Court in Lynch and other cases, the trial court applied the correct rule of law in conducting its analysis. See Willacy, 696 So.2d at 695. Thus, the only remaining question is whether the trial court’s conclusion that the murder was CCP is supported by competent and substantial evidence in the record. See Franklin v. State, 965 So.2d 79, 98 (Fla.2007). We conclude that it is.
As stated above, the CCP aggra-vator applies when the evidence supports each of the four elements described in Lynch. First, the murder must have been “cold,” in the sense that the killing was “the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage.” Lynch, 841 So.2d at 371. The “cold” element “generally has been found wanting only for ‘heated’ murders of passion, in which the loss of emotional control is evident from the facts.” Walls v. State, 641 So.2d 381, 387-88 (Fla.1994). “[E]xecution-style killing is by its very nature a ‘cold’ crime.” Lynch, 841 So.2d at 372.
Second, to prove that a murder was “calculated,” “the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident.” Lynch, 841 So.2d at 371. “The calculated element applies in cases where the defendant arms himself in advance, kills execution-style, plans his actions, and has time to coldly and calmly decide to kill.” Wright, 19 So.3d at 299. A plan to kill may be demonstrated by the defendant’s actions and the circumstances surrounding the murder even when there is evidence that the final decision to kill was not made until shortly before the murder itself. See Durocher v. State, 596 So.2d 997 (Fla.1992).
Third, the circumstances of the crime must indicate that the defendant killed the victim with heightened premeditation. See Lynch, 841 So.2d at 371. “Heightened premeditation necessary for CCP is established where ... the defendant had ample opportunity to release the victim but instead, after substantial reflection, ‘acted out the plan [he] had conceived during the extended period in which [the] events occurred.’ ” Turner v. State, 37 So.3d 212, 225-26 (Fla.) (quoting Alston v. State, 723 So.2d 148, 162 (Fla.1998)), cert. *820 denied, — U.S. -, 131 S.Ct. 426, 178 L.Ed.2d 332 (2010). “[T]his element exists where a defendant has the opportunity to leave the crime scene with the victims alive but, instead, commits the murders.” Wright, 19 So.3d at 300.
Finally, the murder must have been committed without any pretense of moral or legal justification. See Lynch, 841 So.2d at 371. “[A] pretense of moral or legal justification is any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.” Walls, 641 So.2d at 388 (footnote omitted).
Each of these factors is supported by the record. The evidence establishes that after making several attempts to steal money from Elizabeth Uptagrafft’s bank account, Baker drove her to a remote location. Baker maintained both during the interrogation and at trial that he had not planned to kill her; rather, he claimed that after letting Elizabeth out of the car, he “just freaked out.” The trial court was entitled to discount this testimony because there is no evidence of a frenzy, panic, or fit of rage. The drive to the Mondex gave Baker ample time to contemplate his actions. He drove to a location that not only prevented his victim from summoning help, but that was also suitable for concealing the victim’s body. He told the officers that he “felt like if [he] was going to go down, [he] might as well go down for something.” Importantly, contrary to Baker’s statement that he shot Elizabeth twice in quick succession as she was running away from him, the medical examiner testified that she was shot in the forehead at close range. The physical evidence is thus consistent with an execution-type killing. Finally, Baker has not argued, and there is no indication in the record, that the murder was committed under any pretense of moral or legal justification. Accordingly, we find that the trial court’s conclusion that the murder was CCP is supported by competent and substantial evidence.
HAC
Baker next argues that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel (HAC). See § 921.141(5)(h), Fla. Stat. (2006). As with CCP, a finding of HAC is reviewed to determine (1) whether the trial court applied the correct rule of law in finding the aggravating circumstance, and if so, (2) whether the finding was supported by competent and substantial evidence. See Lynch, 841 So.2d at 368 (citing Way v. State, 760 So.2d 903, 918 (Fla.2000)).
The HAC aggravator has been defined by this Court in the following terms:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
State v. Dixon, 283 So.2d 1, 9 (Fla.1973).
This Court has emphasized that in order to be HAC, “the crime must be both conscienceless or pitiless and, unnecessarily torturous to the victim.” Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992). As the trial court correctly observed in its sentencing order, “This Court has consistently held that ‘fear, emotional strain, and *821 terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.’ ” Lynch, 841 So.2d at 369 (quoting James v. State, 695 So.2d 1229, 1235 (Fla.1997)).
On one hand, the evidence in this case demonstrates that the victim was executed quickly by a single gunshot wound to the forehead. The medical examiner testified that death from this wound would have been instantaneous. “Execution-style killings are not generally HAC unless the state has presented some other evidence to show some physical or mental torture of the victim.” Ferrell v. State, 686 So.2d 1324, 1330 (Fla.1996) (quoting Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996)). However, we believe that in light of the totality of the circumstances surrounding the murder, the State presented sufficient evidence of physical and emotional suffering to support the trial court’s conclusion.
In several cases, this Court has affirmed a finding of HAC when the evidence has shown that the victim was abducted and murdered by summary execution. In Routly v. State, 440 So.2d 1257, 1264 (Fla.1983), we found that a murder was HAC where the victim, an elderly widower, was assaulted in his home, bound and gagged, robbed, placed into the trunk of his own car, driven to an isolated area, removed from the trunk and shot three times. We cited several other cases in which similar abductions followed by summary executions were determined to be HAC, explaining that “[t]he common element in these cases is that, before the instantaneous death occurred, the victims were subjected to agony over the prospect that death was soon to occur.” Id. at 1265.
Overall, the facts of this case demonstrate a series of acts, each of which was committed with utter indifference to the suffering of the victim and subjected Elizabeth Uptagrafft to prolonged physical and emotional torment. Of note, she was shot in the head during the initial break-in and was prevented from seeking medical treatment during the entirety of the kidnapping. The physical evidence introduced at trial showed that this wound caused profuse bleeding. She was held captive as her family was assaulted in front of her. She was forced to remain with her captors at gunpoint for several hours before being driven to a rural area and shot to death. Based on the totality of the circumstances surrounding the robbery, kidnapping, and murder, we find that the trial court did not err in finding that the murder in this case was HAC.
Proportionality
Next, Baker argues that death is not a proportionate punishment in his case. In reviewing a death sentence for proportionality, this Court must compare the circumstances surrounding the appellant’s offense with the circumstances of similar cases to determine whether death is an appropriate sentence. See Wade v. State, 41 So.3d 857, 879 (Fla.2010), cert. denied, — U.S. -, 131 S.Ct. 1004, 178 L.Ed.2d 835 (2011). The purpose of our proportionality review is “to prevent the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Parker v. State, 873 So.2d 270, 291 (Fla.2004). In conducting this review, this Court conducts a two-pronged inquiry to “determine whether the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.” Almeida v. State, 748 So.2d 922, 933 (Fla.1999). However, proportionality analysis “is not a comparison between the number of aggravating and mitigating circumstances.” Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, this entails ‘a qualitative review by this Court of the underly *822 ing basis for each aggravator and miti-gator rather than a quantitative analysis.’ ” Simpson v. State, 8 So.3d 1135, 1148 (Fla.2009) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)).
In this case, the trial court found three aggravating circumstances: (1) the capital felony was committed while Baker was engaged in the crimes of home invasion robbery and kidnapping and was committed for pecuniary gain;[6] (2) HAC; and (3) CCP. The court found that the only statutory mitigating circumstance that had been fully proven was Baker’s age of twenty years old. Finally, the trial court found the following nonstatutory mitigating circumstances: (1) brain damage, low intellectual functioning, and drug abuse;[7] (2) Baker suffered from fetal alcohol exposure, was born into an abusive family, and was neglected as a child; (3) remorse; (4) Baker was well behaved and displayed appropriate demeanor during court proceedings; and (5) Baker confessed to his crime and cooperated with police.
We have previously affirmed death sentences in cases involving factual circumstances similar to the instant case, in which a defendant has robbed, kidnapped and, finally, murdered a victim. In Knight v. State, 746 So.2d 423 (Fla.1998), for example, the defendant approached a victim with an automatic rifle, forced the victim to drive home and get the victim’s wife, then forced the victim and his wife to drive to a bank and withdraw $50,000 in cash. The defendant then forced the victims to drive to a remote location, where he killed both the husband and wife execution-style. See id. at 427-28. This Court found that the trial court had erred in finding that the murders were HAC, see id. at 435, but nonetheless found the two death sentences to be proportionate where the remaining aggravators of prior violent felony, kidnapping, purpose of preventing arrest, pecuniary gain and CCP remained valid and outweighed nonstatutory mitigation of the defendant’s childhood abuse, paranoia, and the fact that he was raised in poverty. See id. at 426 n. 1, 437.
In Fennie v. State, 648 So.2d 95 (Fla.1994), the defendant and his co-perpetrator carjacked the victim at gunpoint, forced her into the trunk of her car, and drove around for a period of time attempting to use the victim’s credit card to obtain money from several ATMs. The perpetra *823 tors eventually drove the car to a wooded area, removed the victim from the trunk, and shot her in the back of the head. See id. at 96. The trial court found five aggra-vators (kidnapping, avoid arrest, pecuniary gain, HAC, and CCP), and ten nonstatuto-ry mitigators including that the defendant came from a broken home, was the father of three children and paid child support when he could, counseled children about the perils of a life of crime, was a model prisoner, and was not known to be violent. See id. at 96-97. This Court concluded that death was an appropriate penalty. See id. at 99.
Finally, in Routly, 440 So.2d at 1260, the defendant bound and gagged an elderly widower at gunpoint, searched the victim’s home for money and valuables, placed the victim in the trunk of the victim’s own car, then drove the victim to an isolated area, removed him from the trunk, and shot him to death. Although the jury recommended life in prison, we upheld the trial court’s override of the jury verdict where the trial court found five aggravating circumstances (committed during the course of a felony (burglary and kidnapping), avoid arrest, pecuniary gain, HAC, and CCP) and no mitigating circumstances. See id. at 1266.
Here, we are confronted with a case in which the appellant forced his way into the victim’s home, shot the victim in the head, assaulted the victim’s mother and son, and then held the family at gunpoint for several hours while he and his girlfriend searched the house for valuables. The appellant next kidnapped the victim, stealing her car and holding her against her will for several more hours while he attempted to purchase drugs and steal money from her bank account. Finally, he drove the victim to a wooded area where, the evidence demonstrated, he killed her execution-style by shooting her in the forehead at close range.
As discussed above, we conclude that the trial court did not err in finding that the murders were both HAC and CCP, which we have previously emphasized are “two of the most serious aggravators set out in the statutory sentencing scheme.” Larkins v. State, 739 So.2d 90, 95 (Fla.1999). Further, although the trial court gave “some weight” to the defendant’s troubled upbringing and mental deficiencies, we observe that the court did not find either of the statutory mental health miti-gators to have been fully proven. See Burns v. State, 699 So.2d 646, 650 (Fla.1997) (“The consideration given statutory mental mitigators, depending on the evidence presented to support them, may be substantial.”).
On balance, we conclude that death is a proportionate punishment. We have previously affirmed the death sentence in cases involving a similar kidnapping and robbery, followed by a summary execution. The aggravating circumstances are among the most compelling in the statutory scheme. Moreover, the mitigating evidence presented is not of the type that this Court has traditionally considered sufficient to bring a case out of the category of the “least mitigated” capital cases. See Almeida, 748 So.2d at 933. Accordingly, we find that the circumstances presented in this case are sufficient to support the death penalty.

Ring v. Arizona

As his last issue, Baker argues that Florida’s death penalty scheme is unconstitutional based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Ring, the United States Supreme Court held that, when an aggravating circumstance operates in capital sentencing as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that the aggravator must be found by a jury. As Baker ac *824 knowledges, “This Court has repeatedly and consistently rejected claims that Florida’s capital sentencing scheme is unconstitutional under Ring.... ” Darling v. State, 966 So.2d 366, 387 (Fla.2007).
Moreover, we have previously explained that Ring is not implicated when the trial court has found as an aggravating circumstance that the crime was committed in the course of a felony. See McGirth v. State, 48 So.3d 777, 795 (Fla.2010) (citing Robinson v. State, 865 So.2d 1259 (Fla.2004)). In this case, Baker was convicted of both home invasion robbery and kidnapping by a unanimous jury during the guilt phase of his trial. Accordingly, Ring is not implicated. See Cave v. State, 899 So.2d 1042, 1052 (Fla.2005) (holding that the defendant was not entitled to relief under Ring where the jury unanimously found the defendant guilty of robbery and kidnapping during the guilt phase).
Sufficiency of the Evidence
Finally, we address whether the evidence was sufficient to support Baker’s conviction for first-degree murder. This issue has not been addressed by either party. In death penalty cases, however, regardless of whether the parties raise the issue, this Court is required to conduct an independent review to determine whether sufficient evidence exists to support the conviction. See Fla. R.App. P. 9.142(a)(6); Phillips v. State, 39 So.3d 296, 308 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010). The evidence in a capital case is judged to be sufficient when it is both competent and substantial. See Phillips, 39 So.3d at 308. This Court must “view the evidence in the light most favorable to the State to determine whether ‘a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.’ ” Rodgers v. State, 948 So.2d 655, 674 (Fla.2006) (citing Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
In this case, Baker was charged with, and the jury was instructed on, both first-degree premeditated murder and first-degree felony murder. The jury then returned a general verdict of guilty. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 73 (Fla.2004).
Significant evidence was presented in support of the conviction. Baker provided a detailed description of the robbery, kidnapping, and murder during his interrogation. Baker’s account was corroborated by substantial witness testimony and physical evidence. Charlene Burns testified at trial regarding the details of the break-in and robbery, and identified Baker as the person who broke into her home. Baker and Roosa were arrested after being observed in the victim’s car. Several items were found in the car, including Elizabeth’s ATM card, as well as blood stains that matched Elizabeth’s DNA. Elizabeth’s blood was also present on the clothes Baker was wearing at the time of his arrest. Dr. Steiner, who performed the autopsy, testified that Elizabeth died from a gunshot wound to the forehead and that the gun was fired from a distance of no more than eighteen inches.
Based on this evidence, a rational trier of fact could have found the elements of first-degree murder beyond a reasonable doubt. See Rodgers, 948 So.2d at 674. With regard to first-degree premeditated murder, Baker stated during his interrogation that he decided to kill Elizabeth after letting her out of the car. The fact that the fatal gunshot was delivered in close proximity to the victim’s forehead supports a conclusion that the murder was intentional and premeditated, rather than reckless or accidental. With regard to first-degree felony murder, Baker admitted to *825 committing both the robbery and kidnapping. That Baker committed these felonies was supported by Burns’ testimony as well as by the fact that Baker and Roosa were discovered in the victim’s car along with items taken from the victim’s home. Further, the evidence showed that the victim was killed with the same gun that was used during the robbery. Thus, we find that under either theory, competent and substantial evidence was presented to support the conviction.
CONCLUSION
For the reasons discussed above, we affirm Baker’s conviction for first-degree murder and his sentence of death, as well as his additional convictions and sentences.
It is so ordered.
CANADY, C.J, and LEWIS, QUINCE, POLSTON, and LABARGA, JJ, concur.
PARIENTE, J, concurs in part and dissents in part with an opinion, in which PERRY, J, concurs.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The indictment alleged both first-degree premeditated murder and first-degree felony murder. See § 782.04(l)(a)l.-2., Fla. Stat. (2006).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The court considered the first two factors as a single aggravator, stating: "When a homicide occurs during the course of a robbery, the felony-murder aggravator and the pecuniary-gain aggravator cannot both apply. Francis v. State, 808 So.2d 110, 136-37 (Fla.2001). As a result, the home invasion robbery/kidnapping theory and the pecuniary gain aspect will be considered together as one aggravating factor.”

. The court rejected Baker's argument that he was under the influence of “extreme mental or emotional disturbance” (trial court’s emphasis), but nonetheless explained that Baker's personal background and medical and psychiatric history were entitled to some weight as mitigation.

. As previously noted, the trial court merged the "murder in the course of a felony” and pecuniary gain circumstances into a single aggravator, citing this Court’s decision in Francis v. State, 808 So.2d 110, 136-37 (Fla. 2001) (explaining that the pecuniary gain ag-gravator must merge with the murder in the course of a felony aggravator when the latter is based on a robbery conviction). However, we note that the merging of these two aggra-vators appears to have been unnecessary, since the murder in the course of a felony aggravator was, in this case, also based on the defendant’s commission of a kidnapping. See Griffin v. State, 820 So.2d 906, 915-16 (Fla. 2002) (finding that the kidnapping and pecuniary gain aggravators only need to be merged when they refer to the same aspect of the crime). Where "the pecuniary gain aspect of the murder was the reason or motive for the robbery and murder,” while ”[t]he kidnapping was merely a means to facilitate or make easier the robbery,” the two aggrava-tors refer to different aspects of the crime and do not need to merge. Id. at 915.

. In finding this mitigator, the trial court incorporated its previous discussion finding that the two mental health statutory miti-gators, although not fully proven, were entitled to weight as mitigation. In its discussion of the statutory mitigators, the court first explained that Baker was not suffering from an "extreme” disturbance, but that his mental and emotional disturbances were entitled to "some weight.” Second, the court found that Baker’s mental and emotional impairments did not affect his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Nonetheless, the court assigned the combined nonstatutory mitigator “little weight.”