PER CURIAM.
Terry Marvin Ellerbee, Jr., appeals his judgment of conviction for first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For reasons set forth below, we affirm Ellerbee’s convictions and death sentence.
FACTUAL AND PROCEDURAL HISTORY
Overview
After a jury trial, Terry Marvin Eller-bee, Jr., was convicted of the September 2006, first-degree murder of Thomas Del-larco in Okeechobee County, Florida. In addition to first-degree murder, Ellerbee was charged with and convicted of the contemporaneous burglary of Dellarco’s home with an assault or battery while armed; grand theft of a firearm for stealing Dellarco’s shotgun; cruelty to animals for thrice shooting one of Dellarco’s dogs before entering the home; and grand theft of a motor vehicle, for stealing Dellarco’s automobile. At the penalty phase, the jury recommended death by an eleven-to-one vote. After conducting a Spencer hearing,[1] the trial court entered a Sentencing Order accepting the jury’s recommendation and imposing the death penalty. In this direct appeal of his judgment of conviction and death sentence, Ellerbee raises twelve issues challenging the effectiveness of his trial counsel and various rulings and conclusions made by the trial court at both the guilt and sentencing phases — including an issue regarding the proportionality of the death sentence. He also challenges the constitutionality of Florida’s capital sentencing scheme. We first discuss the factual and procedural history of the case. We then address the various legal issues raised through this appeal. Lastly, although neither party challenges the sufficiency of the evidence supporting Eller-bee’s conviction for first-degree murder, we examine the evidence in accordance with our independent duty to do so, and conclude that competent, substantial evidence supports the jury’s verdict of guilt for Ellerbee’s first-degree murder of Del-larco.
*734 The Guilt Phase
The evidence introduced at the guilt phase of trial established that on September 29, 2006, the body of Thomas Dellarco was found dead and decomposing, hidden under a blanket in the garage of his home. Dellarco was killed by a single .22 caliber bullet which entered the center of the top of his skull and traveled through his brain. Dellarco was seventy-two at the time of his death and had a number of health problems including gout, arthritis, partial blindness, trouble with his hearing, and difficulty with walking. Notwithstanding these infirmities, Dellarco lived alone with his pet dogs in a clean house on the Viking Prairie (the Prairie), a desolate, rural, and wooded area in Okeechobee County.
The sheriff deputies investigating the scene of the killing found cigarette butts strewn throughout Dellarco’s house, blood stain patterns consistent with Dellarco having been shot from a distance greater than eighteen inches while he was sitting in the kitchen area of the home, and blood stains indicating that someone had attempted to clean the scene and dragged Dellarco’s body into the garage. One of Dellarco’s large German shepherd dogs— the one most protective of his master — was found dead outside the home with fatal bullet wounds. Further investigation conducted by law enforcement revealed that, in the days following Dellarco’s demise, someone was using Dellarco’s bank card to obtain cash and make retail purchases, and someone unsuccessfully attempted to cash a $1000 check drawn on Dellarco’s bank account — and in doing so left an inked thumbprint with a bank in Sebring, Florida.
The cigarette butts found in Dellarco’s house contained saliva deposits which, when tested, contained DNA that uniquely linked Terry Marvin Ellerbee, Jr. — a twenty-one-year-old man who was living with his girlfriend and her infant child in various hunting camps on the Prairie — to the scene of the crime. The thumbprint and video footage obtained from the Sebr-ing bank confirmed that Ellerbee was the individual who attempted to cash the check purportedly signed by Dellarco. Moreover, additional evidence, including receipts, eyewitness testimony, banking records, and video surveillance, established that Ellerbee was using Dellarco’s vehicle and was the individual using Dellarco’s bank card in the days following his death. When apprehended, Ellerbee ultimately confessed to entering Dellarco’s house and killing him.
During the guilt phase of the trial, the jury was presented additional evidence that demonstrated the facts and events leading up to and following Dellarco’s death. Ellerbee first met his girlfriend Amber Reed in a cell phone chat room and the two eventually began to date. In the spring of 2006, Amber Reed, who was pregnant with another man’s child, decided to move to Okeechobee, Florida, to live with Ellerbee. Ellerbee did not have a place of his own, but lived with a friend, Evadean Hutchison, and her children. El-lerbee moved Amber Reed into Evadean’s home, but after a few months Evadean ordered him to leave, allowing Amber Reed and her child to remain. Ellerbee moved into a slaughterhouse for a few days and then moved into his father’s house, where he slept for a couple of nights.
On the morning of September 13, 2006, Amber Reed asked Evadean if she could borrow her Ford Explorer to go to a social services office to get food stamps for the baby. Evadean acquiesced, but stated that she needed the car back by ten that morning. Amber Reed never returned the vehicle. Instead, she picked up Ellerbee from his father’s house, purportedly to *735 give Ellerbee a ride to work, at which time Ellerbee got behind the wheel and drove Amber Reed and the baby out to the Prairie. After calling Ellerbee and Amber Reed several times, Evadean reported her car as stolen to the Okeechobee Sheriffs Office.
Once on the Prairie, Ellerbee drove around until he found a “very secluded” recreational vehicle camper (RV camper). He broke into the RV camper and moved Amber and the baby in. Although the RV camper had no electricity, Ellerbee ran wires from the battery of Evadean’s Explorer into the camper. In the following days, Ellerbee made numerous trips away from the RV camper bringing back items such as a pistol, a .22 rifle, and a shotgun. Ellerbee would later admit that he burglarized at least three hunting camps on the Prairie during this period.
The RV camper and the property on which it sat belonged to Anna Jones, who also owned a separate home on the Prairie. In the early morning hours of September 21, 2006, Anna Jones drove out to the RV camper and noticed the Explorer (later established as Evadean’s stolen vehicle) parked nearby. Jones testified that it looked as if someone had “taken up residence” in the RV camper. She noticed a clothesline with clothes on it and a commercial mower that had been used to cut the grass round the camper. She took down the license plate number of the Explorer and knocked on the door; a skinny girl — Amber Reed — answered the door carrying a “newborn” baby. Amber Reed told Jones that her boyfriend, who was out walking on the Prairie, said they had permission to be there. Jones told Amber Reed to leave or she (Jones) would call the police. Ellerbee, who was watching from afar, returned to the RV camper, and he and Amber Reed hurriedly packed up their things and left.
After being evicted from the RV camper, Ellerbee drove Amber Reed and the baby around on the Prairie until they came upon “the red house” (Red Camp), where they “basically set up residence.” Red Camp was old and “very dirty.” Ellerbee was dissatisfied with his living conditions and declared that he “deserved to live better than this”; he then set out on the Prairie by foot, armed with three guns, a “bunch of ammo,” and four to six throwing knives in his boots. Thomas Dellarco — the victim — owned a nice, clean home one mile north of Red Camp. According to Amber Reed, a “couple of hours” after Ellerbee declared his right to better living conditions, he returned to Red Camp, “very happy,” driving a “very clean” light blue Ford Explorer — it was Dellarco’s automobile. He told Amber Reed that he borrowed the truck from a man and was late coming back to Red Camp because he “had to wait for the man to get home.” They left Red Camp for the night and stayed in a motel in Sebring.
In Sebring, Ellerbee and Amber Reed used the victim’s bank card to obtain money and make purchases and unsuccessfully attempted to cash a check drawn on Del-larco’s checking account. The next day, they returned to Red Camp. According to Amber Reed, it was then that Ellerbee told her that he killed Dellarco. Ellerbee told her that he planned to bury Dellarco’s body in the backyard and that they could move into Dellarco’s house. According to Ellerbee, it was a “very nice” home with a pool. Ellerbee told Amber Reed that Del-larco had no family and no one would care if he was gone. Ellerbee and Amber Reed stayed on the Prairie for several days until they sensed an increased presence of law enforcement in the area. According to Ellerbee, he was hiding in the woods and watched law enforcement officers recover Evadean’s Explorer from Red Camp. And, *736 on the same day, he was spying on the police from the woods outside Dellarco’s house when Dellarco’s body was discovered. Ellerbee then left the Prairie in a hurry in Dellarco’s vehicle, discarded the .22 caliber rifle, and moved into a friend’s trailer in Osceola County where he remained with Amber Reed and her baby until Ellerbee was arrested several days later by the Okeechobee County Sheriffs Office. On October 4, 2006, Ellerbee was arrested and read his Miranda[2] rights, after which he confessed that he “took the old man’s life” with a .22 caliber rifle.
In addition to the aforementioned evidence that links Ellerbee to the scene of the crime, Ellerbee, after first asserting that he had nothing to do with Dellarco’s demise, provided a statement to law enforcement that explained what occurred between Ellerbee’s assertion that he deserved to live better than in a dilapidated shack and his elated return hours later with Dellarco’s vehicle and the opportunity to live in a nice house. In his recorded statement to law enforcement, which was admitted into evidence and published to the jury, Ellerbee told police that he had long planned to live on the Prairie to “get away from society.” Ellerbee did not own a piece of property on the Prairie, however, and he admitted to breaking into several hunting camps on the Prairie to live and procure supplies. Ellerbee admitted that on the day of the murder he approached Dellarco’s home and spoke in a friendly and “neighborly” manner to Dellarco, whom he otherwise did not know. Dellar-co gave Ellerbee a cigarette and informed Ellerbee that he would be travelling into town, a considerable distance, to run errands. Ellerbee then walked into the woods adjoining Dellarco’s home and, after watching Dellarco leave for town, he shot one of Dellarco’s dogs that was in the yard. Ellerbee entered the house armed with a single-shot .22 caliber rifle and a pistol that he brought to “back [him] up, for the dogs.” Ellerbee told police that he remained in Dellarco’s house while Dellar-co was away on his trip to town for a “good hour,” and that he watched from inside the house as Dellarco returned and parked his vehicle outside the gate to the yard. El-lerbee stated that Dellarco, after first parking his vehicle, observed the dead dog and then walked across the yard. Thereafter, Dellarco came into the house angered, and then left the house to attend to his other dogs. During this time, Ellerbee remained in the house and hid in Dellar-co’s bedroom. After Dellarco was finished tending to his dogs outside, he came back inside the house and sat down at the kitchen table to make telephone calls. At this time, Ellerbee emerged from the bedroom, braced himself in a doorway across the room, raised the .22 caliber rifle and fired it, killing Dellarco. According to Ellerbee, Dellarco did not threaten him in “any way”; rather, the victim was not aware of Ellerbee’s presence in the house. Eller-bee admitted that after he killed Dellarco, he took a wallet and cash from the dead man’s pants, and he then took and used Dellarco’s vehicle. Ellerbee admitted to using Dellarco’s bank card and trying to cash a check drawn on Dellarco’s bank account, and taking a .20 gauge shotgun that he found in the house. Ellerbee also admitted that he moved Dellarco’s body to the garage and covered it with a blanket when he could no longer “stand the smell.”
Notwithstanding the inculpatory aspects of Ellerbee’s statement to law enforcement officers, he also stated he did not “know” or “remember” where he shot Dellarco because he closes his eyes when he shoots a gun. And, later in his confes *737 sion, Ellerbee told police that, although he shot and killed Dellarco, he intended his single shot — which was fatal and hit the victim in the center of the top of the skull — to be a “miss shot” so as to distract the victim to facilitate an escape. Further, Ellerbee stated that he entered Del-larco’s house looking for food and money. According to Ellerbee, he remained in the house for an extended period because he could not find anything “quick to eat”— requiring him to cook a can of tuna fish. Nevertheless, inconsistent with his statement that he did not know or remember where the bullet hit Dellarco, Ellerbee also admitted to wiping up Dellarco’s blood and wrapping a jacket around Del-larco’s head before moving the body into the garage so there would be “less to clean up.” Although Ellerbee did not testify or put on any evidence in the guilt phase, his attorney examined every significant witness and filed numerous pretrial motions to suppress various searches and to exclude incriminating evidence, including the Defendant’s statement to police. But, after evidentiary hearings, none of the pretrial motions were granted.
At the guilt phase of the trial, Ellerbee’s trial counsel requested and obtained a jury instruction on excusable homicide based on the theory of accidental killing. And, consistent with Ellerbee’s statement to the police, Ellerbee’s trial counsel argued to the jury that the fatal shot made by Eller-bee was intended to be a “miss shot,” and thus the killing, although regrettable, was not intentional. In response to the felony-murder theory of first-degree murder, El-lerbee’s trial counsel argued that the State was required to prove that the killing occurred as a “consequence of’ the underlying felony of burglary, but that the State could not prove as much because “at the time the shot occurred, Mr. Ellerbee was not performing a felony,” but was rather “performing a distraction.” The jury unanimously convicted Ellerbee of first-degree murder, burglary with a battery while armed, cruelty to animals, grand theft of a motor vehicle, and grand theft of a firearm.
Penalty Phase
At the penalty phase of the trial, both the State and Ellerbee introduced extensive testimony and evidence in support of the respective aggravating and mitigating circumstances relevant to the imposition of the death penalty. The State introduced the testimony of Ellerbee’s probation officer, who testified that Ellerbee was on felony probation at the time of the murder and that under the terms of his probation, Ellerbee was forbidden from carrying firearms. A sheriffs detective testified that in January 2006, some eight months before the murder, Ellerbee’s family turned over to law enforcement several letters and notes written by Ellerbee outlining his plans to collect weapons and supplies to live on the Prairie and burglarize dwellings, and possibly, as part of a “backup” plan, kill a man — “Henrey Yates” — after having him sign a check, and taking his credit cards and the keys to his house. By agreement of the parties, these notes were entered into evidence only at the penalty phase of the trial and, as conceded by counsel at oral argument, no objection to the admissibility of these notes was raised by the defense. Testimony established that the crimes actually committed by El-lerbee were substantially similar to those described in the written plans.
Toward mitigation, Ellerbee presented testimony from several of his family members and friends that established Ellerbee had a difficult childhood and a poor relationship with his mother punctuated by physical and emotional abuse. Testimony established that, although Ellerbee had a strong relationship with his father, his fa *738 ther used drugs and alcohol in front of Ellerbee, beginning when Ellerbee was a child. The testimony also established that Ellerbee was once addicted to methamphetamine and was involuntarily committed for treatment on mental health grounds as a result of his drug use. Other family friends testified that Ellerbee had a good relationship with his father and “seemed like a good kid,” was an excellent woodsman and good with his hands, but did not apply himself to things that he did not find interesting. Dr. Michael Riordan, a psychologist, testified that Ellerbee had indications of fetal alcohol syndrome and had suffered three or four major head injuries with signs of brain damage. Dr. Riordan also testified that the Defendant was diagnosed with bipolar disorder at the age of sixteen but was not treated.
On rebuttal, the State introduced the testimony of Dr. Gregory Landrum, a psychologist, who testified that Ellerbee had never been diagnosed with bipolar disorder and he did not meet the criteria for this condition. Dr. Landrum also testified that Ellerbee did not suffer from fetal alcohol syndrome, memory disorder, or brain damage and that any cognitive disorder afflicting Ellerbee was slight. Dr. Landrum further testified there was no indication that Ellerbee was under the influence of drugs on the day of the murder and that he did not commit the crime while under the influence of an extreme mental or emotional disturbance, nor did he have any major mental illness. On June 15, 2009, after approximately two hours of deliberation, the jury recommended a death sentence by a vote of eleven to one. A Spencer hearing was held on July 27, 2009, and the Defendant introduced the testimony of his mother, father, and stepmother, all of whom asked the trial court to spare Ellerbee’s life.
The sentencing hearing was held on January 29, 2010, at which time the trial court read the Sentencing Order on the record, and imposed a death sentence. In the Sentencing Order, the trial court concluded that the State had proven four statutory aggravators, which it merged into three, all of which were worthy of “great weight” as follows: (1) that the capital crime was committed while the defendant was on felony probation (under section 921.141(5)(a), Florida Statutes (2006)); (2) that the capital crime was committed during the commission of a burglary, merged with pecuniary gain (under section 921.141(5)(d) & (f)); and (3) that the capital crime was cold, calculated, and premeditated (CCP), without any pretense of moral or legal justification (under section 921.141(5)(i)). The trial court found that the State failed to sufficiently prove that Dellarco was particularly vulnerable due to advanced age or disability, and therefore assigned this proposed aggravator “no weight.” Regarding mitigation, the trial court, mirroring the degree of granularity argued by Ellerbee in his Sentencing Memorandum, analyzed each of the twenty-three nonstatutory mitigators separately (most pertaining to Ellerbee’s drug use and his less than exemplary home life and upbringing) and assigned “minimal,” “very little,” or “little” weight to those miti-gators proven by Ellerbee. The trial court found that Ellerbee failed to prove his assertion that he was under the influence of intoxicants at the time of the murder, or that he has bipolar disorder, fetal alcohol syndrome, attention deficit disorder, or memory deficits. In reaching its conclusions, the trial court accepted the opinion of Dr. Landrum over that of Dr. Riordan. The Sentencing Order indicates that the aggravating factors proven by the State were carefully weighed against the mitigators — using a qualitative analysis— and the “proven aggravating circum *739 stances substantially outweigh the non-statutory mitigating factors.” Based on the foregoing, a death sentence was imposed. This direct appeal follows.
Ineffective Assistance of Trial Counsel on Direct Appeal
In the first issue raised in this appeal, Ellerbee argues that his trial counsel offered ineffective assistance by arguing that the shooting was accidental, because this defense, even if proven, could not defeat a conviction for first-degree murder under the felony-murder theory as charged by the State. Further, Ellerbee asserts that his counsel was ineffective for not presenting a meaningful challenge to the felony-murder theory of first-degree murder. Ellerbee’s claims of ineffective assistance of counsel are raised for the first time here on direct appeal. With rare exception, ineffective assistance of counsel claims are not cognizable on direct appeal. See Martinez v. State, 761 So.2d 1074, 1078 n. 2 (Fla.2000); Kelley v. State, 486 So.2d 578, 585 (Fla.1986); State v. Barber, 301 So.2d 7, 9 (Fla.1974); see also Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987). This is so because an appellate court must, under normal circumstances, confine itself to “review of only those questions” that were before the trial court and upon which a “ruling adverse to the appealing party was made.” Barber, 301 So.2d at 9. An ineffective assistance of counsel claim may be brought on direct appeal only in the “rare” instance where (1) the ineffectiveness is apparent on the face of the record, and (2) it would be “a waste of judicial resources to require the trial court to address the issue.” Blanco, 507 So.2d at 1384. A defendant who asserts ineffective assistance of counsel bears the burden of establishing as much. Id. at 1381.
Here, we are simply not presented with a case where the ineffectiveness of trial counsel, if any, is apparent from the face of the record. Compare Jackson v. State, 970 So.2d 346, 347 (Fla. 2d DCA 2007) (concluding there was ineffective assistance of counsel on direct appeal where complete defense to revocation of probation was available but not raised by counsel and there was “no plausible strategic reason for” counsel to allow defendant to admit violation of probation resulting in five-year prison sentence), and Robinson v. State, 702 So.2d 213, 215-17 (Fla.1997) (noting “extremely unusual” nature of case, including indictment of trial judge for bribery after penalty phase but before sentencing, and granting new trial based, in part, on counsel’s ineffectiveness for not preparing for trial, lying to the jury (for which attorney was disciplined by the Florida Bar), and being improperly compensated), with Martinez v. State, 761 So.2d 1074, 1078 n. 2 (Fla.2000) (stating that defense counsel’s failure to request a jury instruction on alibi did not present ineffectiveness “apparent on the face of record,” notwithstanding several witnesses’ testimony that supported the alibi defense).
Thus, Ellerbee’s claim of ineffective assistance of counsel is not properly presented on direct appeal. Accordingly, we deny this claim without prejudice. See Rodgers v. State, 3 So.3d 1127, 1132 n. 3 (Fla.2009).
Sufficiency of Evidence Supporting CCP
In his second point on appeal, Ellerbee argues that the trial court erred by instructing the jury on the cold, calculated, and premeditated aggravator and by finding this aggravator in the Sentencing Order. Ellerbee contends that the trial court’s finding of the CCP aggravator is based solely on circumstantial, and thus insufficient, evidence. This argument, and the premise upon which it rests, is unavailing. Here, an abundance of direct evi *740 dence — including Ellerbee’s confession— established not only Ellerbee’s guilt, but a reasonable basis for a rational fact finder to conclude that Ellerbee’s act of fatally shooting Dellarco was in accordance with a cold, calculated, and premeditated plan to kill, without the pretense of moral or legal justification. See Russ v. State, 73 So.Sd 178, 193 (Fla.2011) (citing Walls v. State, 641 So.2d 381 (Fla.1994)) (explaining that confession is direct evidence and circumstantial evidence test is not applicable to finding of CCP where evidence of guilt is direct).
In this point on appeal, Ellerbee argues that had the jury or the trial court viewed the facts differently — mainly, had they believed the exculpatory aspects of Eller-bee’s statement made to law enforcement — a different result might have been reached on the issue of CCP. This argument is, in effect, an improper attempt to have this Court reweigh the evidence and make factual determinations on the credibility and reliability of the evidence. Such argument invades the province of the fact-finder and disregards the proper standard of review. See generally Barnhill v. State, 834 So.2d 836, 850 (Fla.2002) (“A trial judge is not prevented from relying on specific statements made by the defendant if they have indicia of reliability, even if the defendant has given several conflicting statements.” (citing Hildwin v. State, 531 So.2d 124, 128 n. 2 (Fla.1988))); see also Fla. Std. Jury Instr. 7.11 (Penalty Proceedings — Capital Cases) (explaining that it is up to jury to determine what evidence is reliable and jury may believe or disbelieve all or any part of the testimony of any witness); see also Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (explaining that in determining sufficiency of evidence question is whether, after viewing evidence in light most favorable to the State, a rational trier of fact could have found that fact in question was established beyond a reasonable doubt) (citing Banks v. State, 732 So.2d 1065,1067 n. 5 (Fla.1999)).
Significantly, the issue before this Court is whether competent, substantial evidence supports the factual finding made below, not whether the evidence could support an alternative view of the case, especially a view properly rejected by the finder of fact. A contrary conclusion would require this Court to impermissibly make credibility determinations and engage in fact finding contrary to its well-established role. See Willacy v. State, 696 So.2d 693, 695 (Fla.1997). “[Cjompetent substantial evidence is tantamount to legally sufficient evidence, and [this Court] assesses] the record evidence for its sufficiency only, not its weight.” McCoy v. State, 853 So.2d 396, 407 (Fla.2003) (quoting Almeida v. State, 748 So.2d 922, 932 (Fla.1999)); see also Durousseau v. State, 55 So.3d 543, 556-57 (Fla.2010), cert. denied, - U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011).
A determination of whether CCP is present is based on a consideration of the totality of the circumstances. Wike v. State, 698 So.2d 817, 823 (Fla.1997); see also Lynch v. State, 841 So.2d 362, 372 (Fla.2003); Rodriguez v. State, 753 So.2d 29, 46 (Fla.2000); Occhicone v. State, 570 So.2d 902, 905 (Fla.1990). When this Court evaluates a trial court’s decision finding an aggravating circumstance:
[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job. Rather, our task on appeal is to review the record to determine [1] whether the trial court applied the right rule of law for each aggravating circumstance and, if so [2] whether competent substantial evidence supports its finding.
*741 Baker v. State, 71 So.3d 802, 818 (Fla.2011) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
Here, an abundance of physical and testimonial evidence, along with Ellerbee’s admissions, all entered into evidence and presented to the jury, supports a finding that Ellerbee had “put a plan together” to collect guns and other supplies, to facilitate his goal of living on the Prairie. Ellerbee did not own a piece of property on the Prairie. Thus, as evidenced by Ellerbee’s actions, his admissions, and his written plan, there is a basis for the jury to have reasonably inferred that Ellerbee devised and carried out a plan to collect weapons and occupy homes and structures on the Prairie not belonging to him — a plan that was not thwarted by the intervention of his family, the terms of his probation, or law enforcement officers who had confronted Ellerbee after receiving the notes from his family some eight months before the killing.
The testimony of Amber Reed established a reasonable basis for a finder of fact to conclude that shortly before he took Dellarco’s life, Ellerbee declared that he deserved to live better than in a dilapidated shack, and set out on the Prairie heavily armed to obtain that to which he believed he was entitled. The evidence further establishes a reasonable basis for a rational finder of fact to conclude that Ellerbee, in furtherance of his plan, located a nicer residence on the Prairie and familiarized himself with its owner through calm and deliberative means. The evidence supports a finding that El-lerbee, by speaking calmly and kindly to Dellarco, harvested information sufficient for Ellerbee to conclude that Dellarco lived alone — and based on Ellerbee’s assessment, had no friends or family that would miss him should he be killed and buried in the backyard — and that Dellarco would be leaving for town for a prolonged period. The evidence supports a finding that Ellerbee, after first shooting Dellar-co’s dog, entered Dellarco’s house armed with deadly weapons collected in accordance with a plan, and remained in the home for a period sufficient to allow contemplative reflection. The evidence supports a finding that Ellerbee was presented with multiple unused opportunities to flee the house without killing or encountering Dellarco — even after Dellarco returned from his trip. Further the evidence supports a finding that upon his return, Dellarco was unaware of Ellerbee’s presence in the home and that Dellarco did not threaten or provoke Ellerbee in “any way.” The evidence further supports a finding that Ellerbee, from a place of hiding, shot a single, well-placed bullet through Dellarco’s skull and in doing so, removed the only perceived obstacle standing in the way between Ellerbee and the heightened standard of living which he felt he deserved and for which he had long planned. These facts and the evidence supporting same are sufficient to establish a basis upon which a rational fact finder could find CCP without a pretense of moral or legal justification. See Wright v. State, 19 So.3d 277, 299 (Fla.2009) (“The cold element is generally found in those murders that are not committed in a heat of passion.”); see also Baker, 71 So.3d at 819 (“The calculated element applies where a defendant arms himself in advance, kills execution style, plans his actions, and has time to coldly and calmly decide to kill.”) (internal citations omitted); Wright, 19 So.3d at 300 (explaining heightened premeditation usually involves prearranged plan to kill but can also be shown “where a defendant has the opportunity to leave the crime scene with the victims alive but, instead, commits the murders.”) (internal citations omitted); Dennis v. State, 817 So.2d 741, 765 (Fla.2002) (up *742 holding CCP where facts showed defendant arrived at the apartment before the victim and waited for her arrival). Accordingly, we deny the relief requested by Ellerbee in this point on appeal.
Proportionality of Death Penalty
In the third point on appeal, Eller-bee argues that the death penalty is disproportionate based on the lack of clarity in the facts surrounding the shooting, and also because of the mitigation established at the penalty phase.
In this case, the trial court found three aggravators were established beyond a reasonable doubt — capital crime committed while on felony probation, capital crime committed during the commission of a burglary, merged with crime committed for pecuniary gain, and CCP — each of which was assigned “great weight” by the trial court. And, although the trial court found that Ellerbee proved the presence of most of the twenty-three mitigating circumstances argued in his Sentencing Memorandum,[3] the trial court found that these mitigating factors were worthy of “minimal,” “very little,” or “little” weight. Based on this Court’s consideration of the record and the evidence introduced at the guilt and penalty phases of the trial, we conclude that the trial court’s findings relative to the aggravators and mitigators are supported by competent, substantial evidence, and the trial court did not abuse its discretion in assigning weight to the various aggravators and mitigators presented by the parties. Accordingly, we do not disturb these findings on appeal. See Blackwood v. State, 777 So.2d 399, 412-13 (Fla.2000) (explaining that the Court will *743 not disturb sentencing judge’s determination as to the weight assigned to mitigator where ruling is supported by competent, substantial evidence); see also Blake v. State, 972 So.2d 839, 846 (Fla.2007) (explaining that the Court will affirm the weight given to aggravator if based on competent, substantial evidence); Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006).
Ellerbee argues that the death penalty is not warranted because the facts surrounding the shooting of Dellareo are unclear. Under the facts presented here, this argument is unavailing. Here, the facts surrounding Dellarco’s shooting were sufficiently clear and established to support a finding of CCP, rendering Del-larco’s death the product of heightened premeditation and a careful plan, not a “robbery gone bad,” distinguishing this case from those where the Court has reversed a sentence of death based, in part, on the lack of clarity in the “circumstances surrounding the shooting.” See, e.g., Terry v. State, 668 So.2d 954, 965 (Fla.1996) (reversing death sentence partially on the basis that there was evidence suggesting that killing resulted from a “robbery gone bad”).
The death penalty should be “reserved only for those cases where the most aggravating and least mitigating circumstances exist.” Terry, 668 So.2d at 965. Therefore, in deciding whether death is a proportionate penalty, the Court makes a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citations omitted). Accordingly, the Court considers the totality of the circumstances and compares the case with other similar capital cases. See Simpson v. State, 3 So.3d 1135, 1148 (Fla.2009).
In Blake, 972 So.2d 839, this Court upheld the death penalty of a twenty-two-year-old defendant convicted of first-degree murder for killing a convenience store clerk during an armed robbery. Blake claimed in his confession that the fatal shot was “intended to be a warning shot,” but he was convicted of first-degree murder and sentenced to death nonetheless. Id. at 841-42. The aggravators in Blake were that the murder was committed by a person on felony probation for nonviolent felonies (one of the aggravators found in the instant case), that the defendant had committed a prior violent felony, and that the murder was committed during a robbery, merged with pecuniary gain (similar to the burglary aggravator in the instant case). See id. at 847. In Blake, we concluded that the defendant’s death sentence was proportional, notwithstanding the fact that CCP was not present, and we also concluded that the felony probation aggravator, although for a nonviolent felony, was significant so as to distinguish the ease from robbery-shooting cases (where death was not a proportional sentence) where CCP was not present. Id. at 848 (“However, this case involves the same two aggrava-tors at issue in Terry, plus an additional felony probation aggravator.”). The ag-gravators in the instant case — CCP (one of the weightiest aggravators), commission of the murder while under felony probation, and commission during a burglary merged with commission for pecuniary gain — are weightier than those presented in Blake, and the mitigators presented here differ in no substantial way from those in Blake (e.g., age of the defendant, good son, remorseful, never displayed violence in front of family, found to have “some” to “moderate” weight by the trial court). Accordingly, Ellerbee’s death sentence is proportional when compared to Blake. And thus, *744 this case, where the aggravators are some of the most serious, and the mitigators carry little weight, falls into the class of cases with the most aggravating and least mitigating circumstances. We therefore affirm the proportionality of Ellerbee’s death sentence.
Dellarco’s Particular Vulnerability
In the fourth point on appeal, El-lerbee argues that the trial court erred in instructing the jury on an aggravator premised on Dellarco’s age and particular vulnerability, under section 921.141(5)(m), Florida Statutes (2006). This Court has explained that the question of whether a victim is particularly vulnerable is a “fact-sensitive” inquiry requiring “more than a birth certificate.” Francis v. State, 808 So.2d 110, 139 (Fla.2001). Here, testimonial evidence was introduced establishing that Dellarco, age seventy-two, was hampered by infirmities that affected his hearing, vision, walking, and endurance, all of which impacted his activities of daily living and potentially made him more vulnerable to the much younger Ellerbee. Indeed, in his confession, Ellerbee used but one adjective to describe the individual that he decided to kill as a part of his plan: “I took the old man’s life.” Thus, the evidence presented here was sufficient to warrant a jury instruction on the statutory aggravator premised on Dellarco’s particular vulnerability, rendering Ellerbee’s arguments on this point without merit. See Stewart v. State, 558 So.2d 416, 420 (Fla.1990) (explaining that where there is evidence of a mitigating or aggravating factor, trial court is required to give instruction on that factor, and it matters not whether factor is ultimately proven); see also Bowden v. State, 588 So.2d 225, 231 (Fla.1991) (“The fact that the state did not prove this aggravating factor to the trial court’s satisfaction does not require a conclusion that there was insufficient evidence of a robbery to allow the jury to consider the factor.”). Accordingly, we deny the requested relief on this point.
Cross-Examination of Expert Witness
The fifth issue on appeal seeks a new penalty phase proceeding based on a particular question asked of Dr. Riordan, Ellerbee’s psychological expert, on cross-examination. For the following reasons, we conclude that the trial court did not commit error, and deny the relief requested here.
In the penalty phase of the trial, Eller-bee introduced the expert opinion testimony of Dr. Riordan, a psychologist, who testified that Ellerbee has bipolar disorder. Dr. Riordan also testified that one of the mitigating circumstances the jury should consider is the fact that Ellerbee was “deprived of medication treatment” for this condition while incarcerated. Dr. Riordan testified that, in his opinion, Eller-bee required medication for his bipolar disorder. Nevertheless, the issue of whether Ellerbee had ever suffered from, or been diagnosed with, bipolar disorder was the subject of much controversy and dispute, a dispute ultimately decided against Ellerbee. On cross-examination, counsel for the State asked Dr. Riordan, over a relevance objection that was overruled, if he had ever called the jail where Ellerbee was being housed and informed someone of his opinion that Ellerbee was being denied needed medication; Dr. Rior-dan answered in the negative. It is this question and answer with which Ellerbee takes issue in this point on appeal.
Here, although Ellerbee offers supposi-tious factual reasons why Dr. Riordan might not have called the jail (e.g., he was a non-treating psychologist and not licensed to prescribe medication — information that was not advanced by Dr. Riordan as part of his answer), he fails to demon *745 strate how the trial court abused its discretion or violated any other principle of law by allowing counsel for the State to ask Dr. Riordan if he informed the jail of his opinion that Ellerbee was being “deprived of [needed] medication” while in jail — an opinion already expressed by Dr. Riordan notwithstanding the scope of his licensure. Under the circumstances, the State’s question posed to Dr. Riordan was reasonable and designed to elicit relevant and probative testimony. See Williams v. State, 967 So.2d 735, 748 (Fla.2007) (stating that admission of evidence is within trial court’s discretion and its rulings will be affirmed unless there has been abuse of discretion); see also § 90.402, Fla. Stat. (2009) (“All relevant evidence is admissible, except as provided by law.”). Accordingly, we deny Ellerbee’s request for the grant of a new penalty phase based on the allegation of improper cross-examination of Dr. Riordan.
Statutory Mitigation
In the sixth issue on appeal, Ellerbee argues that the trial court erred by failing to address in the Sentencing Order the statutory mitigation upon which the jury was instructed. For reasons explained below, we conclude that the trial court did not commit error, and even if we believed there was error, we would find the error invited and harmless.
At the penalty phase proceedings conducted before the jury, Ellerbee requested that the trial court instruct the jury on the statutory mitigators of no significant history of prior criminal activity (see § 921.141(6)(a)); under the influence of extreme mental or emotional disturbance (see § 921.141(6)(b)); and the age of the defendant at the time of the crime (see § 921.141(6)(g)) — and these instructions were given to the jury. After hearing extensive evidence introduced on the ag-gravators argued by the State and the numerous statutory and nonstatutory miti-gators argued by Ellerbee, the jury recommended death by an eleven-to-one vote.
After the jury’s recommendation and prior to the sentencing hearing, Ellerbee’s counsel advised that he would submit a Sentencing Memorandum outlining “every mitigating factor whether statutory” or nonstatutory that Ellerbee would be arguing in his request that the trial court “override” the death penalty recommended by the jury. And the Sentencing Memorandum submitted to the trial court does not include reference to the statutory miti-gators upon which the jury was instructed; rather, it contains argument regarding twenty-three nonstatutory mitigators, each of which the trial court analyzed and addressed in great detail in the Sentencing Order.
The trial court must “expressly evaluate in its written order each mitigating circumstance proposed by the defendant.” Rogers v. State, 783 So.2d 980, 995 (Fla.2001); accord Jackson v. State, 767 So.2d 1156, 1158 (Fla.2000). Here, the trial court, in a detailed and considered manner, sufficiently evaluated each mitigating circumstance proposed by Ellerbee at the time of the sentencing hearing, and thus, under the facts presented here, committed no error.
In the instant case, the Sentencing Order does not contain express analysis of the statutory mitigators upon which the jury was instructed, because these miti-gators were abandoned by Ellerbee in his Sentencing Memorandum, and no request was made for the trial court to make findings on these statutory mitigators. Accordingly, any error committed here was invited or waived. Moreover, the Sentencing Order contains sufficient findings and conclusions — all adverse to Ellerbee — regarding the facts pertaining to the abandoned statutory mitigators, so that it can *746 be said, beyond all reasonable doubt, that the trial court’s failure to address the statutory mitigators in the Sentencing Order did not possibly affect the result reached, rendering any error committed in this point harmless. See generally State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986) (explaining proper inquiry in harmless error analysis is whether there is a reasonable possibility that error affected the result below). Accordingly, the relief sought by Ellerbee in this point on appeal is denied on the merits, and any error committed by the trial court was invited or waived and harmless.
Trial Court’s Ruling on Motion to Suppress Search
In the seventh issue in this appeal, Ellerbee argues the trial court erred in denying a motion to suppress the search of Red Camp which unearthed, according to Ellerbee, Dellarco’s Bank of America Visa card “and other incriminating evidence which was emphasized to the jury as evidence of guilt.” Although Eller-bee correctly points out that the trial court’s order on the suppression of the evidence contains factual errors regarding, inter alia, the correct name of the owner of Red Camp, these errors are insignificant and inconsequential to the legal issue presented. Here, the foundational bases for the trial court’s denial of Ellerbee’s motion to suppress — first announced by the trial court on the record without the nominal errors that now serve as the gravamen of Ellerbee’s grievance — were findings that Ellerbee was, at best, a trespasser at Red Camp, and that he introduced no evidence establishing an actual subjective expectation of privacy at Red Camp or an expectation of privacy that society will recognize as reasonable. The law is clear that for a defendant to have standing to challenge a search, he or she must show a proprietary or possessory interest in the area of search or that there are other factors which create an expectation of privacy which society is willing to recognize as reasonable. See State v. Singleton, 595 So.2d 44 (Fla.1992) (holding defendant does not have reasonable expectation of privacy in stolen vehicle and thus cannot contest search of vehicle). Here, the State demonstrated that Ellerbee was a trespasser at Red Camp, and that the rightful owner granted the sheriffs office consent to search the entire property. Moreover, Ellerbee failed to introduce any evidence, or even on appeal argue any legal authority, establishing a reasonable expectation of privacy. Accordingly, notwithstanding the human error that led the trial court to incorrectly identify the owner of Red Camp in its written ruling, the trial court’s ruling on the Defendant’s motion to suppress the search of Red Camp is affirmed, and the relief sought here by Ellerbee is denied. Further, even if the trial court erred by denying the motion to suppress the search of Red Camp — and it did not — any error complained of in this point is harmless. According to Ellerbee, the only specific piece of evidence improperly admitted as a result of the search of Red Camp was Dellarco’s bank card. This evidence, however, when considered in context of the totality of the record is inconsequential to the ultimate conviction and sentence. Indeed, examination of the entire record leads to the ineludible conclusion that, beyond a reasonable doubt, the verdict reached here could not have been affected by the introduction of Dellarco’s bank card. See Ciccarelli v. State, 531 So.2d 129, 132 (Fla.1988) (explaining that in determining whether error is harmless, “[t]he court must determine not if there is overwhelming evidence of guilt, but if it can be said beyond a reasonable doubt that the verdict could not have been affected by the error”). Accordingly, we deny Eller-bee’s request for a new trial.
*747 Challenges to Florida’s Capital Sentencing Scheme
In issues eight through twelve in his appeal, Ellerbee challenges various aspects of Florida’s capital sentencing scheme, based primarily on the Supreme Court of the United States ruling in Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that Sixth Amendment right to trial by jury rendered Arizona death penalty unconstitutional “to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty”).
Here, the jury found Ellerbee “Guilty of First Degree Murder as charged in the indictment,” and guilty of the contemporaneous burglary, “as charged in the indictment,” and that “[i]n the course of the burglary,” Ellerbee committed a battery while armed with a firearm. These findings, made by the jury, meet the requirements of the aggravators in section 921.141(5)(d) & (f). It is perhaps also worthy of noting that here, there was simply no issue of fact as to whether Ellerbee was on felony probation at the time of the murder. This fact was conceded and furthermore proven by uncon-troverted competent, substantial evidence sufficient to prevent a rational fact finder from reaching a contrary finding — making the aggravator in section 921.141(5)(a) applicable as a matter of law. This Court has consistently held that a defendant is not entitled to relief under Ring if he is convicted of murder committed during the commission of a felony, or otherwise where the jury of necessity has unanimously made the findings of fact that support an aggravator. See Baker, 71 So.3d at 824 (“[W]e have previously explained that Ring is not implicated when the trial court has found as an aggravating circumstance that the crime was committed in the course of a felony.”); see also Douglas v. State, 878 So.2d 1246, 1263-64 (Fla.2004) (rejecting Ring claim where jury convicted defendant of committing murder during the commission of sexual battery); Caballero v. State, 851 So.2d 655, 663-64 (Fla.2003) (rejecting Ring claim where defendant was convicted by unanimous jury of committing murder during the commission of burglary and kidnapping); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (stating that prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury “clearly satisfies the mandates of the United States and Florida Constitutions”). Accordingly, under this Court’s precedent, Ellerbee is not entitled to relief under Ring.
To the extent Ellerbee argues that application of the aggravator in section 921.141(5)(d) is unconstitutional because this aggravator fails to adequately narrow the class of persons eligible for the death penalty, we have previously rejected this argument because eligibility for this ag-gravator is “not automatic,” and does not apply to every individual eligible for first-degree murder under the felony-murder rule. See Blanco v. State, 706 So.2d 7, 11 (Fla.1997). And, addressing Ellerbee’s argument that the Sentencing Order failed to contain language identical to that required by section 921.141(3) — an argument that we have also previously rejected, see Hudson v. State, 992 So.2d 96, 117 (Fla.2008); see also Williams, 967 So.2d at 761—we conclude here that the Sentencing Order was entered timely and contains the written findings necessary for the imposition of the death sentence, consistent with the mandates contained in section 921.141(3)(a)-(b), Florida Statutes (2006).
Finally, we find no merit in Eller-bee’s argument that the under-probation *748 aggravator in section 921.141(5)(a), Florida Statutes (2006), is unconstitutional because, as argued by Ellerbee, it fails to limit the class of individuals eligible for the death penalty. Not every individual who commits first-degree murder is on probation for a prior felony. Thus, the aggravator provided for in section 921.141(5)(a) does not “automatically” apply in every instance of first-degree murder. Rather, this aggravator is applicable only where an individual — already on felony probation— makes the eminently avoidable decision to commit those additional acts constituting first-degree murder. Accordingly, the under-probation aggravator provided for in section 921.141(5)(a) sufficiently limits the class of individuals eligible for the death penalty, rendering its application constitutional. See Blanco, 706 So.2d at 11 (holding statutory aggravator constitutional where its application is “not automatic” and does not necessarily apply to every individual eligible for first-degree murder). For the foregoing reasons, Ellerbee’s various challenges to Florida’s capital sentencing scheme fail, and we deny the relief sought in points eight through twelve in this appeal.
Sufficiency of the Evidence
Ellerbee does not contest the sufficiency of the evidence in this case, but the Court has an independent obligation to review the record for sufficiency of the evidence. See Fla. R.App. P. 9.142(a)(6); Rodgers v. State, 948 So.2d 655, 673-74 (Fla.2006), cert. denied, 552 U.S. 833, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007). In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley, 787 So.2d at 738). That test is met by the evidence presented in this case.
Here, the jury found Ellerbee guilty of first-degree murder on a general verdict form. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 73 (Fla.2004). The evidence fairly demonstrates that Ellerbee admitted to entering the victim’s home to commit burglary. The evidence demonstrates that Ellerbee took a .22 caliber rifle into the house, where he remained for a sufficient period to allow for calm reflection, and then shot and killed Dellarco. Ellerbee’s confession is consistent with evidence from the medical examiner that Dellarco was killed by a single bullet recovered from the victim’s brain. And a firearms expert testified that the bullet extracted from the victim’s brain was a .22 caliber bullet.
Based on the foregoing and this Court’s review of the entire record, the conviction of first-degree murder under both the felony-murder theory and the premeditated murder theory is amply supported by competent, substantial evidence, and is therefore affirmed.
CONCLUSION
After reviewing the issues brought on appeal and conducting our own independent review of the sufficiency of the evidence, we affirm Ellerbee’s convictions for first-degree murder, burglary with a battery while armed with a firearm, animal cruelty, grand theft of a motor vehicle, and grand theft of a firearm and the sentences imposed for these offenses.
It is so ordered.
*749 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Ellerbee argued the following nonstatutory mitigators in his Sentencing Memorandum, all of which the trial court considered and weighed in the Sentencing Order: (1) he grew up without his mother, felt rejected by her, and was raised by his father (proven, but assigned little weight); (2) he did not have proper parental guidance from his father (proven in part — father was less than perfect, but loved Ellerbee, and never physically abused, neglected, or abandoned, him — very little weight); (3) he had a difficult childhood (proven, minimal weight); (4) he had a history of drug and alcohol abuse (proven, very little weight); (5) he suffers from a poor self-concept (proven, very little weight); (6) his parents were divorced, and he was from a broken home (proven, very minimal weight); (7) his mother suffered from mental illness (proven, very little weight); (8) his father abused his mother in front of him (proven, little weight); (9) his mother was cruel and unpredictable (proven, little weight); (10) he would go long periods without maternal contact (proven, very little weight); (11) his father abused drugs and alcohol (proven, little weight); (12) he has limited education (proven, very little weight); (13) he has a low IQ of 83 (proven, very little weight); (14) he suffered childhood trauma (proven, very little weight); (15) he has a history of suicide attempts and self-destructive behavior (proven, little weight); (16) he showed kindness to others (proven, minimal weight); (17) he was under the influence of intoxicants before, during, and after this incident (to the extent the evidence established that Ellerbee used drugs before and after the murder, the trial court found these factors warranted very little weight — nevertheless, the court found that El-lerbee did not prove he was using or under the influence of drugs on the day of the murder, and the court specifically found that El-lerbee was able to "plan things”); (18) Eller-bee cooperated with authorities (proven, in part — Ellerbee cooperated after he was caught — little weight); (19) Ellerbee was a hard worker at several trades ("some evidence,” little weight); (20) Ellerbee will adjust to prison life (proven, very little weight); (21) Ellerbee has "mental health issues,” specifically, a cognitive disorder, bipolar disorder, ADD/ADHD, memory and attention deficits (the trial court found that Ellerbee did not prove he suffered from fetal alcohol syndrome, a significant brain injury, bipolar disorder, ADD/ADHD, or memory deficits, and assigned little weight "to the defendant having a cognitive disorder”); (22) Ellerbee suffers from poor dental hygiene (proven, but no relationship established with murder — very little weight); (23) Ellerbee exhibited appropriate courtroom behavior (proven, little weight).